John Gill *vs.* Ann Wells.

*Specific performance of Contracts—Right of Purchaser of land to have a Title free from reasonable doubt.—Title too Doubtful and unsatisfactory to be forced upon an Unwilling purchaser—Sale under a Decree, of Real estate of which an Infant is the owner in fee, subject to her mother's Life estate in one-half thereof—Article 16, sections 45 to 48, of the Code—Applicability of the Code to the disposition of the proceeds of a Sale made after its Adoption, under a Decree passed previous thereto.*

It is a sound principle of the law relating to the specific performance of contracts, that a vendee is not bound to take an estate fettered with incumbrances, by which he may be subjected to litigation to procure his title; and in a contract for the purchase of a farm he is not bound to accept anything short of an unincumbered legal estate in fee, the title to which is free from reasonable doubt.

Every purchaser of land has a right to demand and to have a title which shall enable him not only to hold his land, but to hold it in peace; and if he wishes to sell it, to be reasonably sure that no flaw or doubt will come up to disturb its marketable value. But the doubt must be considerable and rational, such as would, and ought to induce a prudent man to pause and hesitate;—such as would produce a *bona fide* hesitation in the mind of the Judge passing upon the title.

Under the facts of this case, as stated in the opinion of the Court, it was Held:

That the title tendered by the appellee to the appellant, to a farm which he had contracted to purchase, was not free from reasonable doubt; but was one which would not be satisfactory to persons of ordinary prudence; and was so far involved in doubt as to prevent a Court of equity from forcing it upon an unwilling purchaser.

By the Code, (Article 16, sections 45 to 48,) the authority of the trustee, making sale under a decree in equity of real estate of which an infant is the owner in fee, subject to her mother's life estate in one-half thereof, to pay the proceeds over to the guardian

Gill *vs.* Wells.

of the infant, and the power of the Orphans' Court to control their disposition are taken away, and it is made the duty of the Court which decreed the sale to supervise their investment.

Where a decree in equity for the sale of real estate in which an infant had a fee simple interest, subject to her mother's life estate in one-half thereof, was passed before the adoption of the Code, but the sale was not made until after the Code was adopted, the investment of the proceeds must be made in accordance with the provisions of the Code.

APPEAL from the Circuit Court of Baltimore City.

The bill of complaint in this case was filed by the appellee against the appellant to enforce the specific performance of a contract of sale of a farm in Howard County. The defendant answered the bill; and instead of taking testimony under a commission, the case was submitted upon an agreed statement of facts. The Court (DOBBIN, J.) passed a decree for the specific execution of the contract. From this decree the respondent appealed. The case is further stated in the opinion of this Court.

The cause was argued before MILLER, STONE, ALVEY, ROBINSON, and IRVING, J.

*James Mackubin,* for the appellant.

*Henry E. Wootton,* for the appellee.

MILLER, J., delivered the opinion of the Court.

It is a principle, obviously just, in the law relating to the specific performance of contracts, that the vendee is entitled to have that for which he contracts, before he can be compelled to part with the consideration he agreed to pay. He is not bound to take an estate fettered with incumbrances by which he may be subjected to litigation to procure his title; and in a contract such as is sought to be enforced in this case, the vendee is not bound to accept.

anything short of an unincumbered legal estate in fee, the title to which is free from reasonable doubt. *Buchanan vs. Lorman,* 3 *Gill,* 77; *Owings vs. Baldwin,* 8 *Gill,* 350; *Fry on Specific Performance, sec.* 573; *Waterman on Specific Performance, sec.* 411. The rule that the title must be free from reasonable doubt is comparatively modern, for it was at one time held to be the duty of the Courts in all cases of specific performance to decide either for or against the validity of the title, and compel the purchaser to take it as good or dismiss the bill on the ground that it was bad; and the departure from the old rule was often deprecated by Lord ELDON, and notably in the case of *Vancouber vs. Bliss,* 11 *Ves.,* 458. The modern doctrine however is sustained by abundant authority both in England and in this country, and is ably vindicated by *Mr. Fry* in his excellent book on *Specific Performance of Contracts,* a passage from which on this subject is well worth quoting. "The rule," says the learned author, "has also been objected to as being logically absurd as well as practically injurious; for every title it is said is good or bad, and if so, the Court ought to know nothing of. a doubtful title. But, notwithstanding such doubts, it may be submitted that, having regard to the nature of a suit for specific performance, the rule in question is necessary in point of practical justice and correct in reasoning. It must be remembered that the decree of the Court in such a suit is a judgment *in personam* and not *in rem;* that it binds only those who are parties to the suit and those claiming under them, and in no way decides the question in issue as against the rest of the world; and that doubts on the title of an estate are often questions liable to be discussed between the owner of the estate, and some third. person not before the Court, and therefore not bound by its decision. If, therefore, there be any reasonable chance that some third person may raise a question against the owner of the estate after the completion of

Gill *vs.* Wells.

the contract, the Court considers this to be a circumstance which renders the bargain a hard one for the purchaser, and one which in the exercise of its discretion it will not compel him to execute. Though every title must in itself be either good or bad, there must be many titles which the Court cannot pronounce with certainty to belong to either of these categories, in the absence of the parties interested in supporting both alternatives, and without having heard the evidence they might have to produce, and the arguments they might be able to urge; and it is in the absence of these parties that the question is generally agitated in suits for specific performance. The Court when fully informed must know whether a title be good or bad; when partially informed, it often may and ought to doubt." *Fry, secs.* 575, 576.

As to what doubts will be sufficient no general rule can be laid down. In the case of *Dobbs vs. Norcross*, 24 *N. J. Eq. Rep.*, 327, the Chancellor said: "Every purchaser of land has a right to demand a title which shall put him in all reasonable security, and which shall protect him from anxiety, lest annoying, if not successful suits, be brought against him, and probably take from him or his representatives land upon which money was invested. He should have a title which shall enable him not only to hold his land, but to hold it in peace; and if he wishes to sell it, to be reasonably sure that no flaw or doubt will come up to disturb its marketable value." But a threat or even the possibility of a contest, will not be sufficient. The doubt must be considerable and rational, such as would and ought to induce a prudent man to pause and hesitate; not based on captious, frivolous and astute niceties, but such as to produce real *bona fide* hesitation in the mind of the Chancellor. *Waterman on Spec. Perf.*, sec. 412. We are therefore required to determine whether, in view of the law as thus stated, the title, in the present case, tendered by Mrs. Wells to Mr. Gill, to the farm, the

subject of the contract between them, is so far free from reasonable doubt, as to justify the affirmance of the decree ordering the contract to be specifically executed. That title may be briefly stated as follows:

Mrs. Wells became the purchaser of the farm at a trustee's sale, under a decree in equity. The sale was made on the 20th of March, 1860, and the deed to her from Mr. Hagner, the trustee, was not made until the 12th of August, 1881. The proceedings in the equity case have been offered in evidence, and without going largely into details, they show that Mrs. Wells, and her infant daughter, were, in 1853, the devisees of the farm under the will of Dr. Wells, the deceased husband of Mrs. Wells, and the father of the infant, who was his sole heir at law. Mr. Geo. Wells had also a contingent interest in it under the will, which, however, ceased on the 27th of January, 1861, when the daughter attained the age of eighteen. Throwing out of view, as we may, this contingent interest, the infant, by the terms of the will, became the owner in fee, of the whole estate, subject to a life estate of her mother in one-half of it. The mother was the testamentary guardian of the infant, and in July, 1858, she filed in the Circuit Court for Howard County, where the land was situated, a bill for a sale thereof, consenting to a sale of her life estate, and alleging that it would be for the interest and advantage of the infant, as well as of all others interested therein, that the same should be sold, and the proceeds invested under the order of the Court, subject to the provisions of the will. The infant answered by guardian *ad litem*, and George Wells, the other defendant, also answered, assenting to a sale, so far as his contingent interest was concerned, upon condition that the proceeds be invested as prayed by the bill. Proof was then taken, sustaining the averments of the bill as to the propriety of the sale, and in September, 1858, a decree for a sale in the usual form was passed by the Court. Mr. Hagner, the trustee, had the

property surveyed, and after several ineffectual offers sold part of the land to Mr. Baldwin at private sale, on the 16th of February, 1860, and afterwards, on the 20th of March following, sold the rest of it (being the farm in question) at public sale to Mrs. Wells, for $11,885. By the terms of the decree one-third of the purchase money was to be paid in cash on the day of sale, or the final ratification thereof, and the residue in two equal annual instalments, the whole to bear interest from the day of sale, and to be secured by the bonds of the purchasers satisfactory to the trustee. These sales were duly reported and finally ratified in August, 1860. Baldwin paid his purchase money and the net amount ($1718.88) was with the sanction and by the order of the Court, invested in a mortgage for the benefit of the infant. An auditor's account was also stated and ratified in July, 1861, showing the whole amount of proceeds, and the costs, commissions and expenses of the sale.

After these proceedings nothing further was done in the case, until the 2nd of July, 1881, a period of nearly twenty years. On that day, which was about two months after she had contracted to sell the farm to the appellant, Mrs. Wells filed a petition in the case stating that she had been reported the purchaser of the property, and though she was entitled to have a conveyance therefor, in point of fact through some inadvertence, no deed has ever yet been executed to her by the trustee, but that she took possession of the property from the time of the sale, and has ever since been in possession thereof; that she now desires to sell the same but is embarrassed by the fact that no formal deed has been executed to her; that the trustee is willing and ready to execute the same, but the original plat by which the property was sold is missing from the proceedings, and cannot now be found, and it will therefore be necessary to have a new plat made; that the trustee has long since paid out all the money received by him as proceeds

of the sale, and is therefore without funds to pay for a new survey and plat, but she is willing herself to incur this expense, and she therefore prays for an order authorizing the trustee to have the survey and plat made so that the metes and bounds of the land thus sold to her may be accurately ascertained and set out in the conveyance to be made to her. Upon this petition Judge Hagner, the trustee, endorsed his assent to the passage of such order thereon as to the Court may seem proper, and admits that the land was sold by him to the petitioner as stated in her petition, but he adds "that he received the costs, commissions, and expenses from the purchaser, but none of the residue of the purchase money, *as the proceeds were payable to her in her own right and as guardian of her daughter*, and that no conveyance was made by him because the purchaser did not wish him to make one." The Court thereupon, on the same day passed an order authorizing the trustee to order a survey and plat to be made at the cost of the petitioner and that a deed be executed to her accordingly. The survey having been made, was reported to the Court by the trustee, and upon this report the Court, on the 3d of August following, passed another order directing the certificate of survey and plat to be filed in the cause, and that the trustee execute to the purchaser, Mrs. Wells, a proper deed of the property heretofore sold to her and described in such certificate and plat. The trustee, then, on the 12th of August, 1881, executed the deed, in which it is recited that the purchaser "fully settled for the purchase money *as set forth in the assent of the trustee to the petition* of the said Ann Wells," filed on the 2nd of July, 1881.

Now as the decree in these proceedings was passed in 1858, before the adoption of the Code, the question arises under what statute had the Court upon the case made by the bill, jurisdiction to order a sale? In our opinion, counsel for the appellant is in error in supposing the juris-

diction came from the Act of 1785, ch. 72, sec. 12, extended by section 7 of the Act of 1831, ch. 311. As we have said, the infant was the owner in .fee of the *whole property*, subject to her mother's *life estate* in one-half of it, and we think it clear that a tenant for life and the reversioner have no *"joint* interest or interest *in common,"* and that they do not hold the estate "otherwise *concurrently."* They are separate owners of separate *consecutive* interests in the same land, and to such a case the statutes referred to have no application. But the Act of ·1816, ch. 154, and section 9 of the Act of 1831, ch. 311, exactly meet the case, and it is to them the jurisdiction to pass this decree must be referred. By the first section of the Act of 1816, power was given to the equity Courts to decree a sale of an infant's real estate upon petition of his guardian or *prochein ami,* provided · the infant be summoned and appear by guardian *ad litem,* and it be made to appear to the Court that it will be for the interest and advantage of the infant that the sale should be made; and by section thirteen of the same Act, as amended and enlarged by section nine of the Act of 1831, it was provided that the whole estate might be sold with the consent of the life tenant where the infant was the reversioner, and ·in that case it was made the duty of the Court to "adjudge such part of the proceeds of the sale to be paid, *or* the annual interest of the proceeds to be secured and paid to" the life-tenant, "as shall be judged equitable by the Chancellor or County Courts." By section five of the same Act of 1816, it was provided that the proceeds should be paid over *by the trustee* making the sale *to the guardian* of the infant, to be by such guardian invested under the direction of the Orphans' Court, as ordered by that and the subsequent sections, six, seven, eight and nine. Now if these statutory provisions had remained in force and unaltered when this sale was made and the purchase money became due and payable, the statement of the

trustee on the petition of Mrs. Wells, that all the net proceeds of the sale "were payable to her in her own right and as guardian of her daughter" would have been strictly accurate, and it is probable that both he and the Judges who signed the orders of July and August, 1881, supposed such to be the case, not noticing, or over-looking the fact that the sale was actually made after the Code was adopted, the Code having been adopted on the 14th of February, 1860, and the sale having been made on the 20th of March, following. By the Code a very important change was made as to the disposition of the proceeds where an infant's land is sold under a decree in equity in such a case as this. The authority of the trustee to pay them over to the guardian and the power of the Orphans' Court, to control the investment, were taken away, and it was made the duty of the Court of equity, which decreed the sale, to supervise the investment of the proceeds. *Code, Art.* 16, *secs.* 45 *to* 48. Upon the question whether these provisions apply to this case we entertain no doubt. The decree was passed prior to the adoption of the Code, but the sale having been made after that time, it was clearly competent for the Legislature to change the tribunal under whose direction the proceeds should be invested. We are clearly of opinion Mrs. Wells as guardian of her infant daughter had no such vested right to receive these proceeds, as is protected by the first section of the first Article of the Code.

The law then made it the duty of Mrs. Wells, the purchaser, to pay at least the infant's share of this purchase money to the trustee, so that it could be invested under the Court's direction for her benefit. The infant daughter was entitled to much the largest portion of this money, and the land was liable to be resold at the purchaser's risk in order to enforce its payment. When she purchased, Mrs. Wells entered into a written contract with the trustee to comply with the terms of sale as prescribed

by the decree, but the record of the equity case shows she never paid the purchase money, never gave bonds therefor, and that no effort was ever made to resell the land. It is not even shown in the present case that she ever charged herself in her accounts as guardian with this money, or ever paid any part of it to her ward, or ever obtained a release from her ward on account of it, or that her daughter is now willing to join her in the conveyance to Mr. Gill. It was incumbent upon her as vendor, to aver in her bill and prove these facts if they existed and were important to her title. *Waterman, sec.* 410. They would undoubtedly have strengthened her title, and a deed from her and her daughter, if offered, would have made a title which the purchaser would have been bound to accept. It was admitted in argument that the daughter has married, and that she and her husband are now living. But they are not parties to this suit, nor is it shown they had any knowledge of the purpose of Mrs. Wells to dispose of the farm, or of the contract she had made to sell it to the appellant. Moreover, no notice was given them of her *ex parte* petition of July, 1881, in the equity case, nor were they made parties to that petition. They ought certainly to have been notified before the orders of July and August of that year were passed, and it is reasonable to suppose such notice would have been given but for the inattention on the part of the Court as well as the trustee to the date of the sale. For aught that appears, the daughter may have remained under the disabilities of infancy and coverture, continuously from the date of the sale to the present time. Again, she may have been unwilling to force her mother to pay this purchase money, and have rested content so long as the land which was security for it remained subject to resale under the decree. If she and her husband had been made parties to the petition of July, 1881, they could have come in and explained their position and have either assented to the

execution of the deed, or objected and insisted that the land should be resold by the trustee. But this was not done, and the only instrument which purports to convey to Mrs. Wells the legal title to this estate, is the deed from the trustee executed in pursuance of these orders, thus inadvertently passed, while the proceedings in the equity case to which the deed itself refers, (and which are also of record) show that she has never paid the purchase money amounting to nearly $12,000, and that much the larger part of this money belonged to an infant who is not shown ever to have received a single dollar of it, or that any part of it was ever invested for her benefit as the law required. Under these circumstances we are not prepared to say that this title is free from reasonable doubt, even though no appeal has been taken by the daughter and her husband from the *ex parte* orders of July and August, 1881, and though Mrs. Wells may have been in possession of the land from the date of her purchase. On the contrary, we regard it as one which would not be satisfactory to persons of ordinary prudence, and one which is, at least, so far involved in doubt as to prevent a Court of equity from forcing it upon an unwilling purchaser.

The defect in the title can be cured by a deed from the daughter and her husband conveying their interest in the land to Mrs. Wells, if they are willing to execute it. Such a conveyance would give her a perfect title, and so far as we can see, this is the only mode in which she can obtain such a title without paying in full the purchase money with interest thereon, due by her under her purchase in 1860, or showing that she has already paid to her daughter the latter's proper share of it, and obtaining a deed from her and her husband by an adverse proceeding in equity. But although such a deed would enable her to sell the land hereafter, it is too late for her now to obtain

·it for the purpose of enforcing the contract in the present case.·

*Decree reversed, and*
*bill dismissed.*

(Decided 7th March, 1883.)