## TRUSTEES OF SHARP STREET STATION OF THE METHODIST EPISCOPAL CHURCH *vs.* ROBERT M. ROTHER.

*Marketable Title—Specific Performance—Adverse Possession—Land Conveyed in Trust for Religious and Educational Uses.*

The rule that equity will not compel a purchaser to take a title not free from reasonable doubt applies with emphasis to a case where the proposed vendor has no record title, but relies upon adverse possession and the invalidity of trusts contained in certain deeds, the parties to which or their representatives are not before the Court.

Defendant agreed to lend a sum of money to be secured by a mortgage of certain real estate to a religious corporation which claimed to be the owner of the land. Upon a bill for the specific performance of the contract, it appeared that although the corporation had been in possession of the property for more than fifty years, paying no rent, it had no record title to the same. The only deeds offered in evidence were, (*a*) a deed from S. made in 1811 by which he conveyed to nine persons, called Trustees of the African Church, a part of the lot in question, in trust that the rents, &c., be applied towards the education of poor colored children, under the direction of said trustees, according to the rules of the M. E. Church ; (*b*) in 1833 the same grantor made another deed to the same trustees reciting that the restrictions, &c., in the first deed were not according to the intention of the trustees and conveyed the same lot in trust for the purposes prescribed by the members of said church or by the persons having power so to do ; (*c*) in 1802 C. conveyed the larger part of the lot to nine persons (four of whom were the same as in the other deeds) in trust for the education of black children and for the use of Africans in communion with the M. E. Church, &c. *Held,*

1st. That although the corporation may have a good title by adverse possession, yet it is not established by such evidence as will justify a decree for specific performance, since it is not shown under what circumstances the corporation took possession of the property; whether with the consent of the trustees under the deeds or not, or, if with their consent originally, that the corporation afterwards held adversely so as to affect the legal title.

2nd. That if there could be a reverter to the heirs of the grantors in the original deeds in the event of a diversion from the trusts therein set forth, yet there had not been such a diversion so as to allow the

Statute of Limitations to begin to run, the land having been used for the purposes contemplated by the deeds.

3rd.  That the provisions of the deeds are not so free from doubt as to justify the Court in passing upon their validity, &c., in the absence of parties whose rights would not be thereby conclusively determined.

Appeal from a *pro forma* decree of the Circuit Court of Baltimore City, dismissing the bill of complaint.

The cause was argued before McSherry, C. J., Bryan, Fowler, Briscoe, Page, Boyd and Russum, JJ.

*John Prentiss Poe* (with whom was *George G. Carey* on the brief), for the appellant.

*Alfred S. Niles* and *Oscar Wolff,* for the appellee, submitted the case on their brief.

Boyd, J., delivered the opinion of the Court.

This appeal was taken from a *pro forma* decree of the Circuit Court of Baltimore City dismissing the bill of complaint, and also overruling exceptions to some testimony. The appellee entered into a contract in writing with the appellant, whereby he agreed to loan it twenty-seven thousand dollars, to be secured by a mortgage on the property claimed by it, which is situated on Sharp street, in the city of Baltimore, upon the express understanding that the appellant was seized of a good and merchantable title.  The mortgage was duly executed and tendered to the appellee, who refused to accept it because he was advised that the appellant did not have such a title.  The bill alleges that the refusal of the appellee to make the loan was based on the claim that by reason of alleged trusts attempted to be created by certain deeds, the appellant could not properly secure him the repayment of the money, " and then denies the existence of any such trusts and avers that for more than fifty years it had held actual possession of the lot of ground ; that its possession had been adverse and continued without interruption throughout that time ; that it improved the prop-

erty and had exercised exclusive use and ownership over
it," etc.   The appellee filed with his answer three deeds,
one from John Sinclair to Jacob Gilliard, Sr., and eight
others, called "Trustees of the African Church, in the city
of Baltimore," dated May 30th, 1811, by which the rear
portion of the lot now claimed by the appellant was con-
veyed to them as joint tenants, in trust, "that the rents,.
issues and profits arising from said premises shall be applied
and appropriated towards the education of poor colored chil-
dren, to be admitted into school under the direction of the
trustees of the African Church, in the city of Baltimore,
which have or may from time to time be regularly and duly
appointed according to the rules and discipline of the Meth-
odist Episcopal Church, and to or for no other use or pur-
pose whatsoever."   On August 30th, 1833, the same
grantor made another deed to the same grantees, in which
he referred to the execution of the former deed and recited
that the purposes, restrictions and obligations intended to be
imposed upon the trustees by that deed were unlawful and
without authority and contrary to the intention of the trus-
tees, which had caused much discontent and misunderstand-
ing between the trustees and the congregation, and then
undertook to convey the same lot to the trustees and their suc-
cessors forever "in trust for the purposes prescribed to them
by the members of said church, or by the persons having
power so to do, and for no other purpose whatsoever."   On
May 15th, 1802, James Carey executed a deed to Jacob
Gilliard, Sr., and eight others (four of whom were the same
as those in the other deeds), by which he undertook to con-
vey the front and largest part of the lot to the grantees and
their successors "in trust, nevertheless, that the said lot or
parcel of ground and buildings, with the appurtenances,
shall be for the use and benefit and serve as a school for the
education of black children of every persuasion, and also for
the use, benefit and behoof of the Africans in the city of
Baltimore and belonging to and in communion with the
society of Christians commonly known by the name of the

Methodist Episcopal Church in the United States of America, according to the rules and discipline which from time to time may be agreed upon by the ministers and preachers of the said church or society of Christians at their general conferences in the United States of America ; and in further trust and confidence that the said trustees and their successors shall at all times hereafter permit. such ministers and preachers belonging to the said church or society of Christians as shall from time to time be duly authorized by the General Conference to preach and expound God's Holy Word therein." It further provided for filling vacancies by the remaining trustees.

It is contended on the part of the appellant that the trusts undertaken to be created by these deeds were void *ab initio* because they are too vague and indefinite, and also because they create perpetuities, and that, inasmuch as valuable considerations were paid, the grantees took the beneficial interest and there could be no reverter to the heirs of Sinclair or Carey. We do not deem it necessary or proper to decide that question, as the parties to the deeds are not represented in this case. The appellant further contends, however, that it is wholly immaterial whether that position be correct or not, as it has acquired title by possession adverse to the trustees, their survivors and heirs, as well as to all other persons, and that it has never recognized the right of any of them to any part of this property.

It may be true that the appellant has a perfectly good title by adversary possession to this lot, but the question is whether it has been so established by the evidence as to justify us in decreeing a specific performance of the contract. No deed or other instrument to it was offered, and John H. Smith, who had been a trustee for thirty years, testified he had no knowledge of any deed from any one to the corporation. He also said that in 1866 he was made secretary of the board, and the deed from Carey and the first one from Sinclair were placed in his custody, "and being the only deeds that I had ever seen or knew anything about, when we

applied for the loan we passed them over as descriptive of the property;" and on cross-examination he said, " when I was elected to the position of secretary these deeds, in common with the insurance and such other papers of that class, were turned over to me to hold, my being the official organ upon the part of the trustees without any instructions on the line of the question." The Rev. N. M. Carroll, who is the pastor of the church and president of the corporation, also testified that he had no knowledge of any deeds from anybody to the corporation and that the two deeds above alluded to were held by the board of trustees as the title papers of the church. They were the only witnesses introduced. The evidence does not show under what circumstances the corporation, as such, entered upon the use of the property—nor does it show when any of the trustees named in the deeds died, whether any successors were ever appointed or what relations, if any, they bore to the corporation, or to the property. The evidence not only does not show that the corporation did not enter with the consent of the trustees or their successors, but the inference might be drawn from it that they did. It is true that the witnesses say they never paid any rent and that the possession and occupation of the property in question by the corporation was not under permission of anybody that they knew of, but under a claim of right, but they do not pretend to say how the corporation originally got possession. If it be assumed that the trustees named in the deeds took the legal title to the lot and if originally the corporation took possession by their permission, there is not sufficient evidence to show that it afterwards held adversely to them so as to affect the legal title. On the contrary, the witnesses say that the board of trustees of the corporation held those two deeds as its title papers and they show on their face that the legal title was not in the corporation. If in point of fact it went into possession by permission of the holders of the legal title, the presumption is that its possession continued in that way, unless there be some evidence of holding adversely to them

in such a way as would amount to an ouster. *Colvin* v. *Warford*, 20 Md. 357 ; *Campbell* v. *Shipley*, 41 Md. 81 ; *Ehrman* v. *Mayer*, 57 Md. 612. The possession of the corporation is not necessarily inconsistent with the title of those grantees. " To give the character of adverse to a holding there must be some positive act and not merely a failure to recognize the rights of trustee." *Matthews* v. *Ward*, 10 G. and J. 457. If such an adverse holding cannot be established against those trustees or their successors, then it is manifest that the appellee cannot acquire such a title as the contract contemplates. The legal title at least would be outstanding and in the event of a default in the mortgage it would be difficult, if not impossible, to sell the property for its real value.

Then, again, if it should be decided that there was or could be a reverter to the heirs of Sinclair and Carey in the event of a diversion of the property from the uses to which it is devoted by the deeds, it might be held that there had not yet been such diversion and the Statute of Limitations had not commenced to run against the heirs of those grantors. The Carey deed, for example, contemplates the use of the part of the lot conveyed by it (which is the greater and most valuable part) for religious as well as educational purposes. Thus far, according to the evidence, the lot has not been used for purposes forbidden by the deed, but for such as it seems to expressly authorize. It is true that it does not appear to have been used by a school for thirty years or more, but as long as it is used for either of the purposes in the deed, the heirs of Carey could not be said to have the right to enter merely because it is no longer used for both. If such be the status of the property and it should be hereafter diverted by the appellee or those claiming under him, then, for the first time, could the heirs of Carey enter or claim the property on that account, and hence the statute could not be said to have yet commenced to run against them. Of course this is all predicated on the assumption that the appellant has not held adversely to the trustees and

their successors, for we do not mean to be understood as saying that this corporation could not hold this property in such a way as to acquire title by adversary possession against both grantors and grantees of those deeds and those claiming under them, but to do so its possession must be inconsistent with the title of the grantees acquired by the deed.

We regret that we do not feel justified in construing the deeds now so as to dispose of such questions as are presented on the face of them. But we do not think their provisions—especially those in the Carey deed—are so free and clear from doubt as would justify us in passing on them when those who might be affected by our conclusions are not before us—particularly as our determination would not be binding on them " otherwise than as a mere precedent, affording persuasive reason to the same conclusion," as was said in *Kelso* v. *Stigar*, 75 Md. 390, of a previous decision in a case in which the persons interested had not been made parties.

This case is unlike that of *Gump* v. *Sibley*, 79 Md. 165, cited by appellant. Sibley had some kind of a record title and the Court had before it such facts as enabled it to determine when and how far the Statute of Limitations took effect, and so also in *Lurman and Fowler* v. *Hubner*, 75 Md. 268, and other cases referred to. But we are not sufficiently informed by the evidence as to the character of possession held by the appellant or the residence and status of those who might make claim to this property to require the appellee to make the loan. We do not determine that the appellant has not acquired a good title by adverse possession, but only that it is not free from reasonable doubt, so far as the evidence in the record discloses. " A Court of Equity will not compel a purchaser to take a title which is not free from reasonable doubt and which might in reasonable probability expose him to the hazards of litigation ;" (*Emmert* v. *Stouffer*, 64 Md. 554), and we think that rule should be applied with emphasis, when the proposed vendor or mortgagor, as in

this case, has no record title whatever.    This Court in *Gill* v. *Wells*, 59 Md. 494, quoted at length from *Fry on Specific Performance of Contracts*, a part of which we will repeat as particularly applicable to this case.    That author says : "It must be remembered that the decree of the Court in such a suit is a judgment *in personam* and not *in rem* ; that it binds only those who are parties to the suit and those claiming under them, and in no way decides the question in issue as against the rest of the world ; and that doubts on the title of an estate are often questions liable to be discussed between the owner of the estate and some third person not before the Court, and therefore not bound by its decision.    If, therefore, there be any reasonable chance that some third person may raise a question against the owner of the estate after the completion of the contract, the Court considers this to be a circumstance which renders the bargain a hard one for the purchaser, and one which, in the exercise of its discretion, it will not compel him to execute.    Though every title must in itself be either good or bad, there must be many titles which the Court cannot pronounce with certainty to belong to either of these categories, in the absence of the parties interested in supporting both alternatives, and without having heard the evidence they might have to produce, and the arguments they might be able to urge ; and it is in the absence of these parties, that the question is generally agitated in suits for specific performance.    The Court when fully informed must know whether a title be good or bad; when partially informed, it often may and ought to doubt."

A prudent lawyer would certainly hesitate to advise his client to accept this title on the evidence in the record, and we cannot say it is so free from reasonable doubt as to authorize us to compel the appellee to accept it.

We are of the opinion that the appellee is entitled to an affirmance of the decree below dismissing the bill, and as we have reached that conclusion without taking into consideration the evidence excepted to, we have not thought it necessary to discuss it.                    *Decree affirmed with costs.*