## ZEPP *v.* DARNALL

[No. 186, October Term, 1947.]

*Decided June 17, 1948.*

The cause was argued before MARBURY, C. J., DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Louis M. Strauss,* with whom was *Joseph W. Scholz* on the brief, for the appellant.

*James C. Morton, Jr.,* and *John G. Rouse, Jr.,* for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Denton Ray Zepp, purchaser of a tobacco farm in Anne Arundel County at a mortgage foreclosure sale,

brought this appeal from an order overruling his exceptions to the ratification of the sale and finally ratifying it.

The farm is a part of a tract said to contain about 398½ acres called "Lebanon," which was acquired by John Thomas by a patent from the State of Maryland in 1790. The tract is situated between Lothian and Owensville between the Harwood-Mount Zion road and Sudley-West River road. About a hundred years ago it was surveyed and divided into two parts, known as the west and east parts. In the second and third decades of the present century it was owned by John T. Hall, Jr., who in 1929 conveyed the west part, divided into four farms, to his four daughters, Mrs. Eugenia Hall Grey, Mrs. Elizabeth Snowden Chaney, Cornelia Hall (afterwards Mrs. Ensor) and Mrs. Ruth Hall Woodyear, and made a will devising the east part to his son, Daniel T. Hall.

In 1934 Mrs. Grey acquired full title to the southwest farm, containing 65.75 acres, designated as lot D. In 1938 Mrs. Chaney acquired full title to the northwest farm, containing 65 acres, designated as lot A. In 1938 Mrs. Grey and Mrs. Chaney conveyed the rest of the west part, containing 108.28 acres, designated as lots B, C, E, F and G, to Mrs. Ensor and Mrs. Woodyear, who in turn conveyed it in July 1939, to Alphonso Siegert and wife. In September, 1939, Daniel T. Hall conveyed the east part, designated as lot H, to Oscar Lynn Siegert and wife. In 1940 Oscar Lynn Siegert and wife conveyed 2.17 acres from the east part to Mrs. Mary G. Brooke; and in January, 1946, they conveyed the rest of the east part, together with 6.51 acres which they acquired from Mrs. Brooke, to Alphonso Siegert and wife.

In March, 1946, Alphonso Siegert and wife conveyed 51.84 acres from the east part to Robert Forrester. On September 26, 1946, they conveyed to George W. Forrester and wife two parcels: (1) Lot B of the west part, containing 44.25 acres, and (2) all that remained of the east part, containing 66.99 acres. On the same day the Forresters gave a mortgage on these parcels to Eugenia

B. Darnall to secure a loan for $7,000. On December 11, 1946, the Siegerts conveyed the rest of their holdings in the west part to Maurice E. Turner and wife. On July 22, 1947, after default by the mortgagors, R. Bennett Darnall, attorney named in the mortgage, sold the two parcels at auction in Annapolis to Zepp, the highest bidder, for $9,000.

Exceptant contends that Darnall sold the property with the assurance that it includes all of lot B, improved by two tenant houses and two tobacco barns, worth approximately $5,000, but that, according to John T. Latham and Fayette M. Latham, surveyors in the firm of J. R. McCrone, Jr., registered professional engineer and land surveyor, who surveyed the property for the Siegerts in 1946, there is a strip of land between lots B and H which the Siegerts failed to convey to the Forresters, and that if their opinion is correct the tenant houses and barns are not on the land conveyed to the mortgagors. Joseph W. Scholz, attorney for exceptant, who specializes in title examination, testified that he tried to fit the descriptions in the deeds with the boundary lines of the original tract, the source of the title, and found that they do not coincide. He said that while there were 262¼ acres in the west part of the tract, the lots which John T. Hall, Jr., conveyed to his four daughters totalled about 239 acres, and hence there is a strip of about 23 acres which was apparently not conveyed by the Siegerts to the mortgagors. The surveyors testified that Siegert in 1946 pointed out to them the east line of lot B, designated as line 2-3, as the line which he wanted them to survey for the parcel which he intended to convey to the Forresters. There was a wire fence around all of lot B, except the west side. The deed for the farm to Mrs. Chaney gives the length of the north lines as 341 and 1,902 feet, or a total of 2,243 feet. Just east of her farm is lot B, containing 44.25 acres, which Alphonso Siegert and wife conveyed to the Forresters. The north line of lot B is 312 feet long, and there is a gap of 63 feet between the northwest corner of this lot and the northeast corner

of Mrs. Chaney's farm. The surveyors added 2,243 feet, the width of Mrs. Chaney's farm, 312 feet and 63 feet, and the total of 2,618 feet is 451 feet less than 3,069 feet, the length of the north line of the entire tract. They declared that they delivered to Siegert their plat, containing a description of lot B prepared from the survey, and showing a strip of land separating lots B and H, and he made no objection to it. They were positive there are no buildings on lot B as conveyed by the Siegerts to the Forresters. After exceptions were filed to the ratification of sale, the surveyors made another trip to the property, and again surveyed the north line of the tract, and verified it for its length and magnetic bearing.

The chancellor, however, disregarded this survey, and found that lots B and H covered by the mortgage are adjacent, and that the buildings are therefore on the land sold at the foreclosure sale. He stated that the north boundary line of the west part of the tract, as described in the deed from John T. Hall, Jr., to his four daughters, runs east from the public road for a distance of 3,069 feet to a stone near Kendall's Branch; but the surveyors must have made a mistake in running this line too far down Kendall's Branch without finding the stone, thus causing a discrepancy when they made the plat, for the lines would not close by at least 240 feet. He said that if they had not been content with surveying first the north boundary line of the entire west part, but had reversed all the lines from the beginning, they would have found that the error in the description was in the length of the original north boundary line.

The chancellor further stated that the surveyors, having no deeds with them, ran five lines along the fence on the east line of the farm formerly owned by Mrs. Ensor and Mrs. Woodyear. The chancellor observed that the deed for lot B describes it as the "northern part" of the parcel of 108.28 acres conveyed by Mrs. Ensor and Mrs. Woodyear to the Siegerts; and that, if it were true that the five lines which the surveyors ran do not coincide

with the dividing lines between the east and west parts of the tract, then lot B would not be the northern part of the parcel conveyed by Mrs. Ensor and Mrs. Woodyear, but only a fraction of the northern part. He held that these five lines constituting the east line of lot B, being mentioned in the deed as "what is used as part of the east boundary" of the parcel conveyed by Mrs. Ensor and Mrs. Woodyear to the Siegerts, must necessarily be the same as that east boundary, and also the same as the west line of the east part of the tract, because the deed from Mrs. Ensor and Mrs. Woodyear to the Siegerts and the prior deed from Mrs. Grey and Mrs. Chaney to Mrs. Ensor and Mrs. Woodyear called for one point in the line of the east part and therefore conveyed to the division line between the west and east parts of the tract. The opinion of the chancellor is a persuasive presentation of his reasons for these conclusions. We cannot say these conclusions are not correct. If they are correct, the Siegerts in their deed stated a simple fact, *i. e.*, that they conveyed "two contiguous lots," in a most obscure way, *viz.*, by having a line surveyed, which need not have been described at all, and then describing it in two different ways.

It is well understood that a bidder at a mortgage sale bids on the assumption that he will receive a marketable title. A title, to be marketable, need not be free from every conceivable technical criticism; objections which are merely captious, although within the range of possibility, should be disregarded by the Court. The test for determining the marketability of a title is whether there is any color of outstanding title or any doubt sufficient to raise a reasonable probability that the purchaser may be subjected to the hazard of litigation to defend his title. A purchaser of real estate should not be compelled to accept a deed with a defective title, but he has the right to demand a title which will give him reasonably safe possession, and protect him from the anxiety that annoying suits may be brought against him, and, if he wishes to sell the property, to make him reasonably sure

that no flaw or doubt will appear to affect its value. In other words, to be marketable, a title must be one which a reasonably intelligent purchaser, who is well informed as to the facts, would be willing to accept in the exercise of ordinary business prudence. *Gill v. Wells*, 59 Md. 492; *Trustees of Sharp Street Station of M. E. Church v. Rother*, 83 Md. 289, 34 A. 843; *Hewitt v. Parsley*, 101 Md. 206, 60 A. 619; *Garner v. Union Trust Co.*, 185 Md. 386, 45 A. 2d 106, 163 A. L. R. 431. We specifically hold that where the evidence shows a defect in the description of the land in one of the deeds in the chain of title, which might be reasonably expected to subject a purchaser of the land to litigation, the deed must be reformed before the title will be marketable. *Scholle v. Scholle*, 56 N. Y. Super. Ct. 399, 4 N. Y. S. 809; *Smith v. Turner*, 50 Ind. 367; 38 L. R. A., N. S., 16.

In the Court below Siegert claimed that he had intended to convey to the Forresters the fields on both sides of the fence. Nevertheless, the surveyors swore positively (1) that the fence was the line which Siegert requested them to survey in 1946 for the east line of lot B, (2) that they designated the metes and bounds of lot B in preparing the description for the deed to the Forresters, and (3) that the houses and barns are not on lot B. On the evidence in the record before us a prudent lawyer would certainly hesitate to advise his client to accept the title. We cannot say that the title is so free from reasonable doubt as to warrant the Court in compelling the purchaser to accept it. Of course, a mortgage foreclosure sale, when it is confirmed by the court, and the purchase money is paid, passes only the title which the mortgagor had in the mortgaged premises at the time of the recording of the mortgage. Code 1939, art. 66, sec. 12. Here two surveyors of a reputable Annapolis firm of engineers positively declared that the description of the land in the mortgage does not embrace the strip of land in question. In this Court exceptant declared that Turner and wife have already claimed title to the strip of land under their deed from the Siegerts. At the hear-

ing in the Circuit Court Turner was present but he was not called as a witness.

For these reasons we find it necessary to reverse the order of ratification, and remand the cause for further proceedings. If the Turners testify that they claim no land between lots B and H, they will be estopped from ever asserting a claim hereafter. In that event exceptant can get a good and marketable title. If they do not so testify, exceptant should not be compelled to buy a lawsuit. In that event a plenary equity case against all parties in interest, including the Turners, may be necessary to clear title and sell the property.

*Order reversed and cause remanded, with costs.*