661 A.2d 220

Evelyn J. COE, et al.

v.

Fannie C. HAYS, Individually, etc.

No. 1815, Sept. Term, 1994.

Court of Special Appeals of Maryland.

July 6, 1995.

Charles F. Wagaman, Jr., Hagerstown, for appellants.

Christopher Joliet (Alex Bognar, on the brief), Hagerstown, for appellee.

Argued before ALPERT, MURPHY and SALMON, JJ.

ALPERT, Judge.

On December 29, 1979, Gail A. Lewis (Mr. Lewis) executed a Last Will and Testament, which provided in pertinent part:

SECOND: *Unto Fannie C. Hays, I give all of my personal property, including but not limited to all furniture and fixtures in my residential home, any motor vehicles which I may own and any monies which I may have at the time of my death.* Also, unto the said Fannie C. Hays, I give and devise a life estate in and for the term of her life in and to a parcel of real estate located in the Hauvers Election District of Frederick County, Maryland, improved with a residential home, containing 8 acres, more or less, and being all and the same parcel of real estate shown and described as parcel # 1 in a deed dated December 6th, 1952 from Roscoe G. Wolfe, et al., unto Gail A. Lewis and wife, said deed being recorded in Liber 518, folio 538, among the Land Records of Frederick County, Maryland. The interest of the said Evelyn A. Lewis having been conveyed unto Gail A. Lewis, by a deed dated August 30th, 1978.

THIRD: *All of the rest, residue and remainder of my estate, I give unto my children equally.*

(emphasis added).

Several years after the execution of the will, Mr. Lewis entered into a contract with Samuel W. and Arthur G. Hessong to sell for $100,000 certain real estate that he owned. Settlement was set for June 1, 1988. Prior to settlement, however, the parties agreed to extend the contract. An addendum was executed, which provided:

Because a title problem has arisen and a complete survey is necessary, we hereby extend this contract until a good and marketable title can be transferred.

■ Mr. Lewis passed away on June 19, 1988, before the transaction could be consummated. Appellee, Fannie Hays, who was not only a beneficiary of Mr. Lewis' will but also his personal representative, settled on the property on November 16, 1988. Several months later, Ms. Hays filed a First and Final Administration Account for the estate in which she indicated that the proceeds from the sale of the property were distributed to her under the will as personal property pursuant to the doctrine of equitable conversion.[1] Subsequently, Mr. Lewis's children, who are the residual legatees under the will and the appellants in the present appeal, filed exceptions to the Administration Account.

On August 11, 1989, appellants filed a Complaint for Construction of Will in the Circuit Court for Washington County, alleging that the proceeds from the sale of the real estate should have been considered realty rather than personalty, and therefore, should have passed to them. Ms. Hays filed an answer in which she again claimed that the proceeds were personal property and passed to her under the doctrine of equitable conversion.

---

1. Under the doctrine of equitable conversion, a conversion occurs as soon as a contract of sale is entered into, vesting the seller with equitable title to the purchase price and the buyer with equitable title to the property. The Court of Appeals has described the doctrine as follows:

> [W]hen the vendee contracts to buy and the vendor to sell, though legal title has not yet passed, in equity the vendee becomes the owner of the land, the vendor of the purchase money. In equity the vendee has a real interest and the vendor a personal interest. Equity treats the executory contract as a conversion, whereby an equitable interest in the land is secured to the purchaser for whom the vendor holds the legal title in trust. This is the doctrine of equitable conversion.

*Himmighoefer v. Medallion Indus., Inc.,* 302 Md. 270, 278, 487 A.2d 282 (1985) (quoting 8A Thompson, *Real Property,* § 4447 at 273–74 (Grimes Repl.Vol.1963)).

Thus, "if a seller dies before the contract is executed, the legal title to the property passes as real estate but his interest in the purchase money passes as personal property." *Hays v. Coe,* 88 Md.App. 491, 499, 595 A.2d 484 (1991) (quoting *In re Estate of Jesseman,* 121 N.H. 313, 429 A.2d 1036, 1037 (1981)).

The trial court found that the doctrine of equitable conversion was not applicable. The court reasoned that the residual clause of the will indicated that Lewis intended for his children to receive his real property and that application of the doctrine of equitable conversion would be inconsistent with this intent. The court also concluded that the doctrine of equitable conversion could not operate "because of the cloud [on title] that existed at that time." The court ordered that the proceeds from the sale of the property be distributed to appellants, the residual legatees.

■ Ms. Hays appealed the decision of the trial court, and this Court reversed in *Hays v. Coe*, 88 Md.App. 491, 595 A.2d 484 (1991). We held that because the contract with the Hessongs was executed before Lewis's death and settlement occurred afterwards, the proceeds from the sale passed to Lewis (and then to Ms. Hays as personal property) under the doctrine of equitable conversion. *Id.* at 499–502, 595 A.2d 484. We also held that neither the contract nor the addendum violated the rule against perpetuities and was not otherwise "indefinite and unenforceable." [2] *Id.* at 505, 595 A.2d 484.

Appellants thereafter appealed our decision to the Court of Appeals. The Court reversed on the basis that Ms. Hays had not produced any evidence at trial indicating that good and marketable title could have been conveyed on June 19, 1988, the date of Lewis's death. *Coe v. Hays*, 328 Md. 350, 362–63, 614 A.2d 576 (1992). The nature of the cloud on title was, according to the Court, "critical to the determination of whether equitable conversion occurred...." *Id.* The Court remanded the case to the circuit court, directing the court to "identify the cloud on title to which it referred and provide the reasons for its conclusion that the property did not equitably convert upon Lewis' death." *Id.* at 363, 614 A.2d 576.

---

**2.** We stated the general rule that in order for the doctrine of equitable conversion to apply, the contract must be valid and binding, i.e., it must not violate the rule against perpetuities or, for some other reason, be indefinite. *See Birckner v. Tilch*, 179 Md. 314, 323, 18 A.2d 222, *cert. denied*, 314 U.S. 635, 62 S.Ct. 68, 86 L.Ed. 509, *reh'g denied*, 314 U.S. 710, 62 S.Ct. 174, 86 L.Ed. 566 (1941).

Upon remand, the trial court ruled in favor of appellants, but did not identify the cloud on title or provide reasons why the doctrine of equitable conversion was not applicable.[3] Ms. Hays appealed and we reversed stating, "As the addendum did not disclose the nature or magnitude of the cloud, the conclusion reached by the circuit court could not be arrived at without considering additional evidence that both parties were preparing to present when the circuit court's decision was filed." *Hays v. Coe*, No. 504 at 5, 98 Md.App. 736, 739 (Md.Ct.Spec.App. filed Dec. 17, 1993). We concluded:

If the circuit court finds that, in order to clear title at the time of Mr. Lewis's death, it was *necessary* to perform the survey and/or execute the confirmatory deed, there can be no equitable conversion. If the circuit court determines that, at the time of Mr. Lewis' death, (1) no cloud existed; or (2) the cloud was not severe enough to prevent transfer of good and marketable title, the doctrine of equitable conversion does apply. Additional evidence is necessary to make this determination.

*Id.* at 7.

Once again, the case was remanded to the circuit court. After further discovery and a hearing, the Honorable Daniel W. Moylan ruled that the cloud on title was not severe enough to prevent transfer of good and marketable title and that, therefore, equitable conversion did occur in favor of Ms. Hays. This appeal followed.

## DISCUSSION

■ The chain of title to the subject property may be traced back to 1896 when Henry Wolf died and, pursuant to his will, left parcels 1, 2, and 3 of the property to his son,

---

**3.** According to Ms. Hays, she filed a motion to alter or amend this ruling, requesting that the court permit her to present evidence as to the nature of the title defect and requesting a determination as to whether marketable title could have been conveyed prior to Mr. Lewis' death. There is no copy of this motion in the record extract. In any event, the trial court issued a revised order denying this request and again·ruling in appellant's favor.

Amos Wolf. In 1931, Amos Wolf conveyed these three parcels, as well as his one-quarter interest in parcel 4, to Roscoe Wolf. In 1952, Roscoe Wolf, in turn, conveyed parcels 1, 2, 3 and one-quarter of parcel 4 to Gail and Evelyn Lewis, who also received the remaining three-quarters of parcel 4 from other parties.

In 1978, Gail and Evelyn Lewis were divorced. Pursuant to the divorce, Evelyn conveyed her one-half interest in the property to Gail by deed. Due to a failure to name Roscoe Wolf in the Being Clause of the 1978 deed, a confirmatory deed was executed by Evelyn Wolf in November 1988.

When the property was sold in 1988 to the Hessongs, a title search was performed by Virginia Kaetzel on behalf of the Hessongs. Ms. Kaetzel testified at trial that in searching the title to the property, she went back to the year 1896, the date of Henry Wolf's death. She discovered that Henry Wolf left the property to Amos Wolf in his will. She admitted, however, that she could not find the source of Henry Wolf's title. She found no deed in which Henry Wolf was the grantee.[4]

Roberta Poffenberger also testified at trial. She was hired by appellants to perform a title search of the subject property. She testified that she discovered a partition suit that was filed in the Circuit Court for Frederick County in 1875 involving the estate of John Smith. She surmised that John Smith owned parcel 1 of the subject property. She stated, however, that she was unable to locate a deed from the trustees in this proceeding to any Henry Wolf.

Appellants argue essentially that the trial court erred in ruling that under the circumstances it was sufficient to go back only fifty-seven years and assume title in the 1931 deed.

---

4. When asked why she went all the way back to 1896, Ms. Kaetzel responded:

[A]s an abstractor, I usually try to perform services that are comparable to the attorney that [sic] I'm searching the title for. [My client] was a very "dot-the-I, cross-the-T" kind of person and he would have expected that to be done. Most times I stop at 60 years, depending on the attorney that [sic] I'm searching the title for.

According to appellants, if a proper title examination had been performed, the title searcher would have discovered the existence of the partition suit among the records of the circuit court, which would have disclosed that Henry Wolf purchased a parcel of the subject property from the trustees of John Smith's estate. This search would have revealed that Wolf paid one-third of the down payment, but would not have revealed whether or not the two-thirds balance was ever paid. Appellants contend that "[i]t is undisputed that there is no recorded deed to Henry Wolf for the parcel he contracted to purchase from the Trustees for the Frederick County Circuit Court." Appellants claim that the title should have been checked back to prior to the conveyance by Henry Wolf to Amos Wolf, i.e., prior to 1896.

Appellants further allege that because there is no evidence that Henry Wolf ever paid the balance of the contract price, he acquired only equitable title to parcel 1 of the subject property. As a result, title to the property was, they contend, not marketable.[5]

The appellate courts in this State have refused to declare any specific time period for which title to property must be searched. In his treatise, The Maryland Title Searcher's Handbook, Bayard H. Waterbury, III distinguishes between a "full title search" and a "limited title search." Bayard H. Waterbury, III, *Maryland Title Searcher's Handbook* § 5–100, at 59–60 (2d ed. 1990). A "limited title search" is typically used to fulfill underwriting requirements, however, a "full title search" describes the "complete legal history" of a parcel of property. Waterbury writes:

> The search period [for a "full title search"] may vary depending on accepted practice requirements as they relate

---

**5.** Appellants rely upon *Garner v. Union Trust Co.*, 185 Md. 386, 390, 45 A.2d 106 (1945), in which the Court of Appeals held:

> [I]t is clear than an equitable title is not marketable, for in reality it is not a title at all, but merely a right to the legal title. By its very nature an equitable title exposes the holder to the hazard of litigation to acquire the legal title, and a purchaser cannot be compelled to accept a title which may be maintainable only by a suit in equity.

to common practice in various jurisdictions, the requirements of individual underwriters and the contents of the search itself. The most prevalent search-time parameter is sixty years; however, there may arise conditions within the search itself which dictate an expansion of this standard (i.e., searches of property subdivided prior to sixty years ago, or lying in metropolitan areas with significantly longer histories, such as Baltimore City). In any case, the search should encompass a length of time sufficient to reveal all circumstances of legal history which might bear on the property's present legal status.

Here, the trial court ruled that it was not necessary to trace title back to and before 1896. The court concluded that "the almost 60 year period starting with the 1931 deed, is clearly an adequate period of time and that the chain of title is in order and that there is no flaw in the title or defect in the title affecting its marketability because of going back into the nineteenth century."

We agree that, under these circumstances, it was sufficient to search the title to the property for approximately sixty years (1988 to 1931). There was substantial evidence at trial supporting the view that this conforms to the customary practice of title abstractors in the area. Tod P. Salisbury,[6] who was admitted by the court as an expert in the area of real estate law, testified that the customary practice is to search a title back sixty years. Indeed, Mr. Salisbury testified that, even if a partition suit was discovered at the beginning of the sixty-year period, he would have accepted that as an adequate search.

Kent N. Oliver, who was also admitted as an expert in this area, similarly testified that "as a rule of thumb," a title searcher should go back sixty years. Mr. Oliver was asked the following:

---

6. We note that this expert's name is spelled "Salsbury" by appellants in their brief, but is spelled "Salsburg" in the trial transcript.

Q. Parcel 1 of our property, is there a deed in 1931 from Amos Wolf to Roscoe Wolf?

A. There is. Liber 385, folio 154.

Q. On an average, would that be a safe place to assume that Amos Wolf had good title, if you're looking for a starting point?

A. It would be my opinion that you could assume in that deed, yes.

Mr. Oliver indicated that he may have been satisfied with the status of title even if the search was done back to 1896. On cross-examination, he stated:

Q. ... [L]et's assume the title abstractor went past your 60 years and went back to the will of Henry Wolf that you're familiar with—the gentlemen died around 1895—do you follow me?

A. Yeah, I don't have the specific date of death but ...

Q. You went back to Henry Wolf ...

A. That's my understanding ...

Q. ... and the abstractor then tried to find where Henry Wolf got title and found no source of title, would you then ignore that?

A. Prior to 1895, probably.

Q. You would just ignore it?

A. If there was a particular ... if there was anything within the title itself that would put you on notice that that may be significant, then, no, I wouldn't have ignored it. If, in this case, you had from 1931, not only was the parcel there but it had a house on it and there was no apparent proceeding in the court or anything else of any adverse claim or of any adverse claimant, probably I would assume in the 1931 deed.

Likewise, Roger Schlossberg, another expert witness in title matters, testified on cross-examination:

Q. 1895, '96, uh, and the title abstractor says I've looked for a deed that's the source of this title and I can't find any

that makes sense to me, uh, would you react to attempt to see if there was a cure for that?

A. No, Chuck, I don't think I would. Uh, this case is probably the perfect example that you've got ...

Q. You mean you wouldn't, you wouldn't go back to look to see if there was a deed to [Henry Wolf]?

A. No, and the reason for that is, is that there are [ ] few old, old titles, that if I look hard enough, I can't find some technical problem relating mainly to age and the way business was done in the 1700's or the 1800's as opposed to the way we do it here in 1994. That's why we have this rule of thumb as it were, roughly 60 years, being the date we decide to assume in, because we've got to cut it off somewhere. I mean, you can go back and you can look and look and look and I guess eventually you can probably find some technical captious nicety in any particular title, no matter how old ...

On direct examination, Roger Schlossberg, also testified:

Q. Okay. As an expert, would you feel safe to assume, start your title or assume in the 1931 deed, Amos Wolf to Roscoe Wolf?

A. Yes, I am confident to assume it at 1931. As I just heard discussed, the subtraction is correct, it's 57 years between 1988 and 1931. I would consider in this particular case that 57 years to be wholly adequate to establish the back title. The 60 years which I've heard thrown around here some today is the rule of thumb that we all learned when we started doing title work, perhaps Your Honor included, but there is no hard and fast rule of 60 years. Title insurance companies tell us that and the standard and practice in the community is that. It sometimes might be as little as 45 years in an appropriate case and in another case you might be uncomfortable and want more. Uh, it's merely a rule of thumb, something to give you some guidance. In this particular case, I'd be wholly satisfied with the 57 years.

We agree with the trial court, therefore, that under the circumstances of this case, searching the title to this property for approximately sixty years back was sufficient. There was no evidence contradicting the testimony of appellee's witnesses that this was all that was necessary.

Even if the title search should have gone beyond sixty years and into the nineteenth century, any potential attack on the title to the property would be by the trustees in the 1875 partition action, or their successors, if any. Such a remote possibility would not render title unmarketable. The Court of Appeals, in *Zepp v. Darnall*, 191 Md. 68, 73, 59 A.2d 774 (1948), stated that title is not marketable if there is "a reasonable probability that the purchaser may be subjected to the hazard of litigation to defend his title." In order to be marketable, a title "need not be free from every conceivable technical criticism; objections which are merely captious, although within the range of possibility, should be disregarded by the Court." *Id.* *See also Garner v. Union Trust Co.*, 185 Md. 386, 389–90, 45 A.2d 106 (1945).

Whether title is marketable in a given case is a question of law for the court. *Berlin v. Caplan*, 211 Md. 333, 341, 127 A.2d 512 (1956); *Fraidin v. State*, 85 Md.App. 231, 248, 583 A.2d 1065, *cert. denied*, 322 Md. 614, 589 A.2d 57 (1991). Here, the court made this determination after careful consideration of all potential clouds on the title to the subject property. We conclude, therefore, that the trial court did not err in ruling that good and marketable title was conveyed to the Hessongs, and that, as a result, equitable conversion did occur in appellee's favor.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.