MAYOR AND CITY COUNCIL OF HAVRE DE GRACE, ET AL. *v.* STATE BOARD OF HEALTH, ET AL.

[No. 319, September Term, 1963.]

*Decided March 19, 1964.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT and HORNEY, JJ., and DUCKETT, J., Associate Judge of the Fifth Judicial Circuit, specially assigned.

*John Henry Lewin,* with whom were *John W. Hardwicke* and *Charles B. Reeves, Jr.,* on the brief, for appellants.

*Louis E. Schmidt, Special Assistant Attorney General,* with whom was *Thomas B. Finan, Attorney General,* on the brief, for State Board of Health and Mental Hygiene, part of appellees.

*J. Wilmer Cronin,* for Cecil Sale, Sr., et al., other appellees.

HORNEY, J., delivered the opinion of the Court.

In this action by the State Board of Health [1] to compel the City of Havre de Grace to construct a sewage treatment plant and place it in operation, the principal question relates to the authority of the Board to enforce compliance with its order directing construction of the plant.

On November 18, 1954, the Board, by virtue of the author-

---

1. What was formerly the State Board of Health is now the State Board of Health and Mental Hygiene.

ity conferred on it by Code (1957), Art. 43, § 393, found as a fact that the absence of a sewage plant in Havre de Grace was a menace to health and ordered the construction of one to be completed by September 1, 1957. There was no appeal from the order, but, despite the Board's offer of the facilities at its command, the time stipulated expired without any action having been taken by the Mayor and City Council.

In October 1959, following a five-year period of inactivity on the part of the City, the Board filed a bill in equity in which it sought to have the court assume jurisdiction of the matter and require compliance with the Board's order and the assessment of penalties prescribed by Art. 43, § 405, for failure to comply with such order. The City advised the court that it had previously engaged the services of consulting engineers in August 1959 and that the preliminary plans and recommendations would not be available for approximately six months. In February 1960, the City, answering the bill, recognized the enforceability of the Board's order, averred that it had begun to obey the order in good faith but had not commenced actual construction of the sewage plant, and, in asserting that it was not necessary for the court to assume jurisdiction, denied that failure to construct the plant theretofore had menaced the public health and that operation of the municipality without a sewage plant was a continuing danger to public health.

Again, despite the Board's offer of additional advisory services, nothing further was done toward constructing the plant until after the expiration of another protracted period of four years, when, in February 1963, the Board moved for an "immediate hearing" and two months later moved for summary judgment on the theory that there was no genuine dispute as to the material facts. The City countered by asserting that there was a real dispute as to material matters which ought to be resolved at a trial of the case on the merits.

Although the record is far from satisfactory and somewhat vague, it appears that there was no genuine dispute of the fact that a sewage plant should be constructed without further delay, but it is apparent that there is a real controversy between the mayor and three of the councilmen on one side (the majority group) and the other three councilmen (the minority

group) on the other side as to where the plant should be located. The majority group favors locating the plant on the State Military Reservation (the site of the former Havre de Grace Race Track). On the other hand, the minority group favors locating the plant on Revolution Street in Havre de Grace at a site closer to Chesapeake Bay. Also, the minority group contests the right of the mayor to vote on measures which are administrative or ministerial in character or to cast a deciding vote in case of a tie in the voting of councilmen on such measures. It also appears that the six-member City Council (exclusive of the mayor) was evenly divided with respect to the employment of special counsel and the continued employment of the same or other consulting engineers, and that the chancellor, on the insistence of the minority group, struck out the appearance of counsel the majority group had employed. As a result of the striking the City as such was not represented at the summary judgment hearing before the chancellor.

Neither the original bill nor the answer of the City was ever amended or otherwise supplemented, and until the minority group, who were not then parties, filed purported answers to the bill, there were no other pleadings. Furthermore, between the date of the filing of the bill, on October 22, 1959, and the day before the case came on for hearing, on October 3, 1963, the only parties to this suit were the State Board of Health as plaintiffs and the City of Havre de Grace as defendant, but on the eve of the day set for the hearing, both the majority and minority groups were permitted to intervene as additional parties and to employ counsel to represent them. Each group employed separate counsel. But apparently because they did not have time, the majority group did not file an answer. Nor did they file any affidavits or depositions in opposition to the motion for summary judgment until after the hearing.

As hereinbefore stated, the minority group had prematurely filed an answer and a supplement thereto before the court had given them permission to intervene, in which, among other things, they undertook to inform the court of a motion passed on May 7, 1962, and a resolution adopted on July 16, 1962, purporting to approve a site (presumably the Revolution Street

site favored by the minority group) and to authorize the mayor to acquire it. In terms the motion, passed by a five-to-one vote, accepted the recommendations contained in the preliminary report of the consulting engineers (which contained a suggestion as to the location of the plant), instructed the city attorney to take the necessary steps to procure title to the site, and employed a Baltimore attorney to do the legal work incident to the issuance of bonds to finance the project. The resolution, certified to have been adopted by the Mayor and City Council, enjoined the mayor to acquire the property required for the completion of the facility by agreement or otherwise.

There was a clear indication in the record that the case would be tried on the merits as well as on the motion for summary judgment, but it was heard only on bill and answer. There were no affidavits or depositions to support the contentions of any of the parties, and there were no admissions on the part of any of the parties. Nor were any witnesses called or any evidence taken. There was the allegation in the answers of the minority group that the Revolution Street site had been previously approved by a majority of the City Council. But there were also oral statements at the hearing to the effect that the perennial dispute as to where the plant should be located had not been resolved, a fact which the court appears to have ignored because it was not included in the pleadings.

At the conclusion of the hearing—despite the fact that the case did not present an issue as to the location of the plant—the chancellor, in addition to prescribing a time table within which the several stages of the construction should be completed, summarily ordered the City "to construct and to place in operation" a sewage plant on the site suggested in the preliminary report of the consulting engineers.

Within the time allowed by rule, the appellants in a combined petition and motion (supported by numerous affidavits made on personal knowledge) sought a rehearing of the motion for summary judgment and a summary declaratory judgment as to other matters. Both were denied but not until after the appeal was taken: the petition by an order in writing; the motion by implication since the chancellor failed to act on it. The petition sought a rehearing because the case had not been tried on

its merits. The court was advised, among various other pertinent things, that the previously employed consulting engineers were now recommending that the Military Reservation site was the most desirable and feasible for the sewage plant, and that the majority group, with the mayor casting the deciding vote to break the tie, acting on the recommendation of the consulting engineers, had adopted a resolution to construct the sewage plant on the Military Reservation site, or at some other location, and had repealed all previous resolutions, motions and other actions indicating approval of the Revolution Street site. The motion primarily sought a declaratory ruling as to the right of the mayor, in accordance with the charter and the long continued and unvarying municipal practice, to cast the tie-breaking or deciding vote on resolutions and other measures not ordinances which determine administrative and ministerial matters. The petition and motion also referred to (but did not present for decision) other points or questions of law affecting the enforceability of the order (requiring construction of the sewage plant and the validity of the bonds to be issued to finance such construction) which might have to be decided by the lower court. One suggested that there was a question as to whether the action of the City in acquiring a site for the sewage plant must be by ordinance rather than by resolution. Another query was whether the provisions of § 395 of Art. 43 of the Code (providing for the raising of such funds as are necessary to comply with the order of the Board without submission of a question as to the issuance of bonds for that purpose to a vote of the people) are applicable rather than the provisions of §§ 368 and 370 of the City Charter (providing for the submission of a question as to issuance of bonds to finance the construction of the sewage plant to the voters on referendum as if the City had taken the initiative to construct it).

After the summary judgment had been entered, the chancellor modified the order granting it *nunc pro tunc* by inserting therein an additional provision as to a minor detail.

There are three appeals. The first is from the summary judgment and from the failure of the chancellor to act on the petition for a rehearing and the motion for a summary declaratory judgment before the appeal was taken. The second appeal is

from the denial of the petition and motion after the first appeal had been taken. And the third appeal is from the *nunc pro tunc* order modifying the original order for summary judgment. The appellees moved to dismiss the second and third appeals, but we think our decision on the first appeal will make it unnecessary to consider either of the motions to dismiss.

In essence the contentions of the appellants are: (i) that the chancellor should not have invaded and usurped the constitutional authority of the Mayor and City Council of Havre de Grace to determine the location or site of the sewage plant; and (ii) that the mayor has a right to cast the tie-breaking vote on resolutions and other measures which determine administrative or ministerial matters. But (iii) the principal question posed by the appeal, as the original plaintiff correctly asserts, relates to the authority of the Board to enforce compliance with the order directing construction of the sewage plant.

It may well be that the Board should have sought relief in a court of law by way of a writ of mandamus rather than in a court of equity. But because the parties appear to have waived the question of jurisdiction, there would seem to be no reason why equity should not retain jurisdiction to compel compliance by the City with the order of the Board.

(i)

We agree with the appellants that the chancellor lacked judicial power to designate the location or site of the sewage plant.

Having found as a fact, after an investigation, that the absence of a sewage treatment plant was a menace to the health of the municipality, all that the Board had authority to do, under the terms of § 393 of Art. 43, was to order the City to construct a plant and put it in operation within a specified time and enforce such order as it might deem proper under the circumstances. The Board was not authorized, nor did it ever attempt to select a site for the location of the sewage plant.

The City, apparently because the Mayor and City Council could not agree on a site, has done nothing of consequence to carry out the order of the Board other than to cause preliminary plans and recommendations to be prepared by the consult-

ing engineers it had employed. Although there is perhaps enough in the record to indicate that the City Council on a prior occasion (despite the refusal of the Mayor to recognize the action) had approved construction of a sewage plant on the site previously suggested by the consulting engineers and had subsequently authorized the Mayor to acquire the land needed for that purpose, no action was ever taken by the Mayor. Nor was any construction contract or financing plan ever formulated or executed. Clearly the mere approval of a site and a command that it be acquired was not adequate reason for the chancellor, under the then existing circumstances, to order construction of the plant on a site which had not been acquired by the City; which a majority of those constituting the present city government had repudiated; and which the consulting engineers had abandoned as undesirable and unfeasible, particularly in view of the fact that it was common knowledge that the present members of the City Council were then evenly divided as to where the plant should be constructed.

It is true, of course, that the order of the Board to construct and put a sewage plant in operation is mandatory, but the ways and means, including the selection of a site, the City chooses to adopt in carrying out the mandate, is discretionary. *Welch v. Coglan,* 126 Md. 1, 94 Atl. 384 (1915). Since the Board had no statutory authority to participate in the selection of the site, it follows that the chancellor lacked power to designate where the sewage plant should be constructed. But that does not mean, as will be pointed out in part (iii) of this opinion, that the courts are impotent to compel compliance with the mandatory order of the Board by requiring the Mayor and City Council to enact an appropriate ordinance, and in the event that body should not comply, to assess the penalties imposable by law until the Mayor and City Council shall see fit to enact an ordinance implementing the order.

(ii)

We also agree with the appellants that the Mayor of Havre de Grace has the right to cast the tie-breaking vote on resolutions and other actions which are administrative or ministerial in character and merely declare the will of the municipal cor-

poration and are not the enactment of a law pertaining to the government of the city. He may not, however, cast the deciding vote on ordinances or other measures of vital importance affecting public policy which are legislative in character and relate to something more than simple temporary matters of little significance.

Prior to 1941, the city charter provided that "in case of a tie vote in the City Council upon any question whatever, the Mayor shall have the right to vote, and shall decide the question in dispute." In *Hecht v. Coale*, 93 Md. 692, 49 Atl. 660 (1901), where the vote of the City Council on a motion to confirm a nomination by the Mayor of a city official was evenly divided, it was held that the Mayor was entitled to cast the deciding vote. But in *Havre de Grace v. Bauer*, 152 Md. 521, 137 Atl. 344 (1927), where the vote of the City Council on a tax-levying measure was likewise evenly divided, it was held that the right of the Mayor to break a tie vote did not apply to ordinances. When, however, the city charter was revised in 1941, the "tie-breaking" provision in the former charter that had been applied in *Hecht* and disallowed in *Bauer* was eliminated from the sections of the present charter regulating the powers of the Mayor and City Council, probably because the provision was not deemed necessary. But the deletion could have been deliberate to preclude the possibility of the mayor voting a second time to break a tie should the provisions of the present charter be construed as giving the mayor a right to vote on administrative or ministerial actions as a constituent member of the city council.

Where the mayor is merely the executive or presiding officer and not a constituent member of the council, the general rule is that he may vote only in the event of a tie. But where the mayor is a member of the council and is not forbidden by law to vote, it is generally held that he may not only vote on all questions as a constituent member, but if the charter gives him a casting vote in the event of a tie, he may vote the second time. See 4 McQuillen, *Municipal Corporations* (3rd ed.), § 13.25; Rhyne, *Municipal Law*, § 5-3; 1 Yokley, *Municipal Corporations*, § 78 (b), (c).

Whether or not there are provisions in the present charter

indicating that the Mayor has a right to vote on administrative or ministerial actions as a constituent member of the City Council is of little consequence in this case and is a question we need not decide at this time. For, having the right under the charter to preside over the meetings of the City Council by virtue of his office, it is well settled, as has already been pointed out, that the Mayor may cast the deciding vote on administrative or ministerial actions whenever there is a tie. See McQuillen, Rhyne and Yokley, all *op. cit., supra.* And this is what the record shows the Mayor has consistently done since the effective date of the present charter. Moreover, there is authority for so doing in the charter itself. In § 353 of the charter (concerning, among other things, the power of a majority of the City Council to approve or disapprove utility rates fixed by the Municipal Utilities Commission) there is a clause providing that "in case of a tie vote on such a proposition, a quorum of the City Council being present, the Mayor may, *as in all other instances* [of administrative or ministerial action], cast the deciding vote." [Italics ours.]

It is equally clear, however, that the power of the Mayor to cast the deciding vote on administrative or ministerial actions in the event of a tie is not applicable to legislative action, for § 280 of the present charter, as did the former charter, although empowering the Mayor to veto or disapprove an ordinance passed by the City Council, specifically provides that "the passage of all Ordinances shall be by 'Yeas' and 'Nays,' * * * and a majority of all members of the City Council elected to said body shall be necessary to pass any Ordinance." The section further provides that should the Mayor disapprove the ordinance, the vote of five-sixths of the elected members of the Council is required to override the veto.

There was no reason why the employment of special counsel to represent the City in this case, since it was for a temporary period only, should not have been authorized by way of a resolution. In *Allen v. Wise,* 50 S. E. 2d 69 (Ga. 1948), involving the discharge of the city comptroller of Savannah by a motion in the nature of a resolution instead of by an ordinance, the Supreme Court of Georgia, after stating that "legislation by a municipal corporation must be put in the form of an ordi-

nance, and [that] acts * * * done in a ministerial capacity and for temporary purposes may be in the form of a resolution," pointed out that "the distinction between an ordinance and a resolution is usually considered to be that, while a resolution deals with matters of a special or temporary character, an ordinance prescribes some permanent rule of government," and held that the motion should be construed as a resolution rather than an ordinance because "the act was administrative in character and was not the enactment of a law pertaining to the government of the city." Similar distinctions between municipal resolutions and ordinances have been made in other cases. See, for example, *Shaub v. City of Lancaster*, 26 Atl. 1067 (Pa. 1893) and *Keigley v. Bench*, 63 P. 2d 262 (Utah 1936).

The general rule applicable to the performance of a ministerial act or the administrative business of a municipality, according to McQuillen, *op. cit.*, § 15.06, is "that where a charter commits the decision of a matter to the council or legislative body alone and is silent as to the mode of its exercise, the decision may be exercised by resolution." And see *Smith v. Ballard*, 129 So. 2d 635 (Miss. 1961), where it was held that a resolution for the employment of a special attorney to assist the city attorney in cases involving the legality of ordinances was sufficient to constitute an employment contract binding on the city. See also *Tharp v. Blake*, 171 S. W. 549 (Tex. Civ. App. 1914), where the manner in which an attorney was employed to represent the city in an election contest was through a resolution. Since § 321 of the charter (unlike § 319 providing that the mayor by and with the advice and consent of the city council should annually appoint a city attorney) specifically authorize the Mayor and City Council "to obtain additional legal assistance" should it "deem it advisable" to do so, there would seem to be little doubt that the authority thus conferred to employ special counsel could be done by way of resolution, particularly in view of the fact that the charter does not provide a different mode of exercising its decision. See § 295 of the charter for a list of those actions which require the passage of ordinances. It follows therefore that the chancellor should not have stricken out the appearance of special counsel the City had employed. But be that as it may, it appears that the City could

not have been harmfully prejudiced since both the majority and minority groups in the city government were adequately represented by competent counsel the respective groups had employed to represent them as individuals.

However, with regard to the so-called resolutions purporting to select different locations as a site for the sewage plant, it is apparent that under the circumstances both were at most no more than mere expressions of opinions or declarations of the wishful thinking of the respective groups that had sponsored them. Clearly, they were not legislative in character and, whatever they may have been, none had the force of law.

(iii)

That a sewage plant must be constructed and put in operation promptly is not now controverted. It is the implementation of the mandate of the Board, particularly the selection of the site of the plant and the cost of installing the sewerage system, that is at the bottom of the controversy. As to the site, the warring factions are literally miles apart. But it is just as certain that the mayor and councilmen must either solve the problem or subject their city to the payment of an initial fine of from $10 to $500 and daily penalties thereafter of from $5 to $50 so long as the orders of the Board are not complied with. Code, Art. 43, § 405.

Although the chancellor should not have designated the site on which the sewage plant is to be erected, it is clear that the City of Havre de Grace, having first selected a site and made arrangements to finance the sewerage treatment system (unless the City can persuade the County and State, or either of them, to cooperate with it in selecting a site and bearing a part of the costs of construction), must comply with the mandatory order of the State Board of Health without further delay. And, if after the receipt of the mandate of this Court, and the lapse of a reasonable time, the City has not begun to comply with the order of the Board, then the lower court (upon the conclusion of such further proceedings as may be required) should, by an appropriate order or decree, require the City to enact such ordinance or ordinances as may be necessary to bring about compliance with the Board's order. In such order

or decree, the court may include such fixed time tables (as the court may determine after the introduction of additional evidence) within which each of the several phases necessary to fully implement the order of the Board of Health shall be completed (including but not limited to such phases as the selection of the site, the final plans and specifications, the financial planning, the solicitation of bids, the signing of the construction contract and the progress schedules of the construction work). Penalties for noncompliance or delay within the limits of § 405 of Art. 43 of the Code may also be included in the order or decree without prejudice to the power of the court to impose further penalties for contempt for disobedience of its orders.

Finally, since it appears to us that the substantial merits of the case require that the order from which the appeal was taken should not be affirmed or reversed but modified, we shall remand the case for further proceedings pursuant to Maryland Rule 871 a, to the end that the pleadings may be amended and additional evidence introduced.

> *Case remanded without affirmance or reversal for such further proceedings, by way of amendment of pleadings and introduction of additional evidence, as may be required for the entry of an appropriate order or decree in conformity with this opinion; costs to be paid by the Mayor and City Council of Havre de Grace.*