## SINCLAIR ET AL. *v.* WEBER

[No. 112, October Term, 1953.]

326

*Decided April 26, 1954.*

*Motion for rehearing and/or clarification and/or modification of opinion filed May 17, 1954, denied May 18, 1954.*

The cause was argued before BRUNE, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*George W. Baker, Jr.,* and *Julius G. Maurer,* with whom was *Clinton Wyatt* on the brief, for the appellants.

*J. Calvin Carney,* with whom was *J. Calvin Carney, Jr.,* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This is a suit for specific performance brought by Ena Gambrill Sinclair, Dorothy Melville Sinclair, and James Edward Sinclair and wife to compel Adam H. Weber to perform his contract to purchase their realty situated at the intersection of Greenmount Avenue and Old York Road in Baltimore.

Complainants, after unsuccessful efforts to sell the property at private sale, authorized their attorney, Clinton Wyatt, to offer it at auction through E. T. Newell & Co., Inc., auctioneers. The advertisement of the sale, published in the newspapers over the names of Clinton Wyatt, attorney and agent for owners, and E. T. Newell & Co., Inc., auctioneers, described the property as a triangular-shape business property, improved by a two-story brick building, at the northeast corner of Greenmount Avenue and Old York Road, "key to Waverly business section." The advertisement announced that the auction would be held on the premises on November 29, 1951, at 3 P.M., and that the terms of sale were as follows: "Cash. Deposit $1,500.00. Settlement within 30 days."

The auction was conducted at the time set by John M. Miller, president of the auction corporation. After receiving more than a dozen bids, Mr. Miller sold the property to defendant, who was the highest bidder, for $12,225. Mr. Miller produced his regular form of memorandum of sale, which was filed in with the location of the property, the purchase price, the date, the signature of the purchaser, his address, and the amount of the deposit. He testified that he attached to it a copy of the advertisement which appeared in the newspapers. Defendant signed the memorandum, and gave Mr. Miller a check for $1,500 payable to the order of E. T. Newell & Co.

The memorandum was kept by the firm. A copy, omitting the second paragraph, was given to defendant as a receipt for his deposit. The memorandum reads as follows:

"This is to certify that I have this day purchased through E. T. Newell & Co., Inc., Auctioneers, the following property: Northeast Corner Greenmount Avenue and Old York Road in fee simple, for which I agree to pay the sum of $12,225.00 on terms announced at this sale.

"I having had the same opportunity as others

to examine the property, agree to pay for same and take title with all its faults and errors of description it being understood that the Auctioneers have made no warranty or representations whatever, except that the title must be found merchantable. If for any reason I am sued under this contract I agree that an additional charge of ten per cent (10%) of the purchase price shall be paid by me as attorney's fee, my bid having been the last and highest bid on the property above described and further that I hereby waive all right to revoke this purchase.

"Witness my hand and seal this 29th day of November, 1951.

"Adam H. Weber    (Seal)

"Address 3033 Eastern Ave.

"Deposit Paid $1,500.00"

Defendant, a real estate dealer, who has been engaged in the business extensively for many years, was given immediate possession of the property. He posted a sign on the building advertising the property for lease and another sign advertising his real estate business. Within a few days he sent his receipt to his attorney, J. Calvin Carney, who employed Wilson C. Warren, a registered surveyor, to make a survey of the land.

On December 13 Mr. Carney informed complainants that the survey had not been completed, and accordingly he did not think he would be able to complete arrangements for settlement by December 28. The surveyor's plat, dated January 8, 1952, shows that the lot has a frontage of 58 feet 4 inches on Greenmount Avenue, and 66 feet on Old York Road. The south side of the lot at the corner measures only 8 feet 6 inches. The north side measures 42 feet 4 inches.

Mr. Carney noticed on the plat that the west wall of the building encroaches from 5 to 13 inches beyond the building line of Greenmount Avenue. He thereupon told

Mr. Wyatt that he did not consider the title marketable on account of the encroachment. Mr. Wyatt was surprised that there should be any such question about the title after the building had been standing on the same spot for about 100 years. However, Mr. Carney, in a letter dated January 18, 1952, notified Mr. Wyatt that the purchaser repudiated the contract of sale and demanded that the deposit of $1,500 be returned. Complainants refused to comply with that demand. On June 5, 1952, they instituted this suit in the Circuit Court of Baltimore City praying that defendant be ordered to pay the balance of $10,725 due under the contract, and interest thereon, and an attorney's fee of 10 per cent of the purchase price, as provided in the contract.

The chancellor held that parol evidence was inadmissible to show that Mr. Wyatt was the authorized agent of the vendors, and since no writing was produced to show that he was their agent, the contract, not containing the names of the vendors, did not comply with the Statute of Frauds. He accordingly entered a decree, from which complainants appealed, dismissing their bill of complaint and ordering them to return the sum of $1,500 to defendant.

The fourth section of the Statute of Frauds declares that no action shall be brought whereby to charge any person upon any contract or sale of land unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized. 2 *Alexander's British Statutes,* Coe's Ed., 690. The memorandum of E. T. Newell & Co., Inc., is signed by the purchaser, but it does not contain the names of the owners of the property and the terms of sale. However, the advertisement which was annexed to the memorandum states the name of the owners' agent as well as the name of the auction corporation that made the sale. We, of course, recognize the rule that while the name of the party to be charged must be signed to the memo-

randum, it is sufficient merely to name the other party or give some designation of him which could be recognized without parol proof extraneous to the instrument. *Grafton v. Cummings,* 99 U. S. 100, 25 L. Ed. 366, 368. We adopt the statement of the American Law Institute that a memorandum, in order to make enforceable a contract within the Statute of Frauds, may be any document or writing, formal or informal, signed by the party to be charged or by his agent actually or apparently authorized thereunto, which states with reasonable certainty, (1) each party to the contract either by his own name, or by such a description as will serve to identify him, or by the name or description of his agent, and (2) the land, goods or other subject-matter to which the contract relates, and (3) the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made. 1 *Restatement, Contracts,* sec. 207; *London v. Riebel,* 189 Md. 376, 56 A. 2d 34.

There can be no objection to the memorandum in this case merely because it consists of two writings, one signed by the purchaser, the other a copy of the advertisement of sale. In *Scholtz v. Philbin,* 157 Md. 196, 198, 145 A. 487, it was held that an auctioneer's memorandum of sale of real estate, to which is attached a copy of the advertisement of sale containing the name of the agent making the sale and the name of the auctioneer, sufficiently identifies those named as the vendors to meet the requirements of the Statute of Frauds. We accept the rule that the memorandum required by the Statute may consist of several writings, if each writing is signed by the party to be charged and the writings indicate that they relate to the same transaction, or though only one writing is signed, if (1) the signed writing is physically annexed to the other writing by the party to be charged, or (2) the signed writing refers to the unsigned writing, or (3) it appears from examination of all the writings that the signed writing was signed with reference to the unsigned writings. 1 *Restatement, Contracts,* sec. 208.

It is an established rule of law that a principal has the right to maintain an action on a written contract made by his agent in his own name, without disclosing the name of the principal, and in such case parol evidence is admissible to prove the agency. *Oelrichs v. Ford,* 21 Md. 489, 501; *Reckord Mfg. Co. v. Massey,* 151 Md. 348, 353, 133 A. 836, 47 A. L. R. 195. The reason for this rule is that such evidence does not vary or contradict the writing, but merely establishes a separate collateral fact, namely the authority under which the agent acted and out of which grew the rights and obligations of the principal under the contract. In this case, therefore, parol evidence was admissible to show that the owners of the property authorized Mr. Wyatt to act as their agent to sell the property with the aid of the auction corporation.

Of course, a memorandum of a contract for the sale of land satisfies the requirement of the Statute of Frauds, though the vendor is described therein as agent, only if the form of contract purports to bind the agent personally. In *Irvmor Corporation v. Rodewald,* 253 N. Y. 472, 171 N. E. 747, 70 A. L. R. 192, Chief Judge Cardozo expressed this principle of laws as follows:

"There is a settled rule of law that a note or memorandum of a contract for a sale of land must identify by name or description the parties to the transaction, a seller and a buyer. * * * If this is done, the memorandum does not fail of its effect, though one who is described as principal or who assumes a principal's obligation is in truth an agent only. * * * Essential it remains, however, that the agent shall bind himself as principal, if the writing does not identify the principal behind him. * * * The memorandum is inadequate where by its terms the principal is not identified, and the agent, though his name is on the paper, is not there as a contracting party."

In this case the auction corporation's memorandum and the accompanying advertisement of sale, taken together, stated both the name of the agent for the vendors and the name of the purchaser. They also described the property and stated the purchase price and the terms of sale. The two papers can be connected with sufficient certainty without the aid of parol evidence. As the auction was advertised as an "attorney's sale," and the advertisement was published by the attorney as "attorney and agent for owners," it is perfectly clear that the attorney bound himself as a contracting party. The memorandum was signed by the party to be charged, Mr. Weber. Therefore, the conclusion is irresistible that these papers constitute a memorandum sufficient to fulfill the requirements of the fourth section of the Statute of Frauds.

We next consider defendant's contention that the title of the property is not marketable. A marketable title is a title which is free from encumbrances and any reasonable doubt as to its validity, and such as a reasonably intelligent person, who is well informed as to the facts and their legal bearings, and ready and willing to perform his contract, would be willing to accept in the exercise of ordinary business prudence. Accordingly a marketable title must be so far free from defects as to enable the purchaser not only to hold the land in peace but also, if he wishes to sell it, to be reasonably sure that no flaw will appear to disturb its market value. However, a title, in order to be marketable, need not be free from every conceivable technical criticism, but only from those possibilities of defect which are sufficient to raise a reasonable doubt. A mere speculative possibility that a defect might appear in the future will not be sufficient to render a title unmarketable. *Garner v. Union Trust Co. of Maryland,* 185 Md. 386, 389, 390, 45 A. 2d 106, 163 A. L. R. 431; *Zepp v. Darnall,* 191 Md. 68, 73, 74, 59 A. 2d 774; *Zulver Realty Co. v. Snyder,* 191 Md. 374, 384, 62 A. 2d 276.

We acknowledge that where the municipality has an undoubted right of action against a property owner because of a substantial encroachment on the sidewalk, and the enforcement of that right would cause the owner substantial loss, the title to the property would not be free from reasonable doubt. A purchaser should not be compelled to rely upon the acquiescence of city officials in substantial interference with the property rights of the public. The municipality may convert a permitted encroachment into a public nuisance at any time by exercising its power to order its removal. The streets of a city or town are held by the municipal corporation in trust for the public. As the right of the public to use the streets in a proper manner is paramount and absolute, they must be kept free from all nuisances, obstructions and encroachments which destroy or materially impair their use as public highways. *Adams v. Com'rs of Town of Trappe*, 204 Md. 165, 102 A. 2d 830. Hence, the decisive test in determining whether the title to a certain property is marketable although it encroaches on a sidewalk is whether the encroachment is so immaterial that the municipal authorities are not likely to disturb it.

In New York City it was the practice of the municipal authorities for more than a century to allow bay windows, oriel windows, show windows, stoops, and porticoes to extend beyond the building line. The courts did not consider such an encroachment a public nuisance as long as it was sanctioned by a permissive ordinance and a permit from the building department. Accordingly, prior to the twentieth century, the courts held that even a substantial encroachment beyond the building line did not affect the marketability of the property, since there was no likelihood of interference by the municipal authorities. Then came the growing density of population and the spread of business into residential districts, creating perplexing traffic problems and producing a radical change in the policy of the city government. The municipal authorities ordered the removal of many

encroachments which it was generally believed would always be free from municipal interference. In consequence of this change in municipal policy, the Court of Appeals of New York found it necessary to lay down a new principle of law in reference to substantial encroachments. The new rule was laid down in *Acme Realty Co. v. Schinasi,* 215 N. Y. 495, 109 N. E. 577, where a vendor sought to enforce a contract for the sale of an apartment building at the corner of 116th Street and Manhattan Avenue. The Court there held that the show windows, oriel windows, and bay window of the building in projecting one foot beyond the building line, and a portico rising two stories above the street in projecting one foot beyond the building line, and a stoop in projecting four feet beyond the building line, which were constructed under permit but were subject to removal by order of the municipal authorities, rendered the title to the building unmarketable.

The instant case is not analogous to the case in New York. It was stated in the Court below that in 1905 the Baltimore City Topographical Survey Commission established the line of York Turnpike Road, now Greenmount Avenue, 66 feet in width for several miles from North Avenue to the city limits. When the highway was opened, the building in controversy was standing exactly where it stands today. Eugene F. Rodgers, who was the Clerk to the Commissioners for Opening Streets in 1905, and who has been a real estate broker in Baltimore for more than 30 years, expressed the belief that the building has been standing exactly where it stands today for at least a century. Assistant City Solicitor Lloyd G. McAllister, head of the Real Estate Division of the Baltimore City Law Department, testified that there were many encroachments throughout the city of Baltimore, but the policy of the municipal government is that if the encroachment does not materially interfere with the public use of the sidewalk, the city will let it remain.

Defendant's surveyor admitted on the stand that the lot is "substantially in conformity with the description

in the deed," and that the encroachment is so slight as to be scarcely noticeable. He further stated: "I would think the average person would not pay any attention to it. They would walk along there and it would not mean anything to them." Defendant himself, when asked whether the encroachment is visible to ordinary pedestrians, admitted: "I do not see how anyone could determine that without a survey."

Lennox V. Clemens, who has been a member of the bar about 45 years, testified that on several occasions he had examined the title to the property now in controversy, and that the Waverly Building Association, acting upon his approval of the title, had loaned money on mortgage on the property.

We are convinced by this evidence that the disclosure in the surveyor's plat that the west wall of the century-old building encroaches beyond the building line of Greenmount Avenue does not render the title to the property unmarketable.

Finally, defendant contended that complainants should be denied relief in equity because of laches. In applying the doctrine of laches a court of equity refuses to grant relief to a complainant who has slept on his rights for an unreasonable length of time, thereby allowing his claim to become stale and causing prejudice to the adverse party. Equity takes the view that deliberate delay or gross negligence constitutes an implied waiver arising from a knowledge of the conditions and an acquiescence in them. In determining what will constitute laches so as to bar relief in equity, the court has no inflexible rule as to length of time, such as in the case of limitations, but must decide the question from all the facts and circumstances in each particular case. *Croyle v. Croyle,* 184 Md. 126, 136, 40 A. 2d 374; *Plitt v. Kaufman,* 188 Md. 606, 615, 53 A. 2d 673; *Kaufman v. Plitt,* 191 Md. 24, 29, 59 A. 2d 634; *Berman v. Leckner,* 193 Md. 177, 187, 66 A. 2d 392; *Mitchell v. Cassedy,* 200 Md. 339, 343, 89 A. 2d 620.

One of the cases cited by defendant was *Vincenti v. Kammer,* 189 Md. 523, 56 A. 2d 688. In that case the contract of sale provided that the balance of the purchase price was to be paid within 30 days, but there was a delay due to examination of the title. The purchaser showed no disposition to perform his part of the contract or to pay the purchase price. Finally, eleven months after the contract was executed, the purchaser entered suit for specific performance. The Court said that the purchaser, instead of either accepting the title or rescinding the contract and resorting to appropriate action, did nothing but wrangle about the judgments which he claimed were liens on the property, and that it was obvious that he had not been ready and willing to carry out his part of the contract.

Defendant also relied on *Emkey v. Siegel,* 192 Md. 571, 64 A. 2d 561. The contract in that case was executed in March, 1947, and was to have been consummated in September. The vendors notified the purchaser in May that they would repudiate the contract. In June the purchaser notified them that he would demand performance. But it was not until February, 1948, after a delay of eight months, and after the vendors had made extensive alterations to the house, that the purchaser instituted his suit to obtain the property. The Court said that, while the vendors should not have failed to perform the contract, they were justified in believing that the purchaser had acquiesced in their action. The purchaser was barred from relief because his delay of eight months in bringing his suit prejudiced the vendors to the extent that they made extensive alterations.

We find in these cases no precedent for the case before us. Here the purchaser notified the vendors by letter dated January 18, 1952, that he rescinded the contract and demanded return of the amount he had paid as a deposit on the property. The vendors filed the suit for specific performance on June 5, 1952. It is true that they waited four months and a half before filing suit, but during that time each party had a claim against

the other, and the attorneys evidently were hoping to reach an amicable settlement. Moreover, the purchaser did not allege and prove that the vendors were guilty of deliberate delay or gross negligence and that he suffered any prejudice by the alleged delay. We, therefore, conclude that complainants are not barred from relief on the ground of latches.

For these reasons we must reverse the decree of the chancellor and remand the case for the passage of a decree specifically enforcing the contract of sale in accordance with its terms.

*Decree reversed and case remanded for the passage of a decree in accordance with this opinion, with costs.*