545 A.2d 1296

**INLET ASSOCIATES**

v.

**ASSATEAGUE HOUSE CONDOMINIUM ASSOCIATION et al.**

No. 35, Sept. Term, 1987.

Court of Appeals of Maryland.

Aug. 26, 1988.

414

**416**

Gerard P. Martin and M. Albert Figinski (Julie C. Janofsky and Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., on the brief), Baltimore, for appellant.

K. King Burnett (Clifton B. Thaw, III, on the brief), Salisbury, for appellee Assateague House Condominium Ass'n et al.

Raymond D. Coates, Jr., Jeffrey B. Cropper (Coastes, Coates & Coates, P.A. for Mayor and City Council of Ocean City, on the brief), Snow Hill, for other appellees.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

This case involves a taxpayers' action to enjoin, and conversely a real estate developer's suit to compel, the conveyance of a municipality's public right-of-way in part of a dedicated street, together with riparian rights purported to accrue as a result of the municipality's interest in the dedicated street:

## I

In December 1984, Inlet Associates (Inlet) obtained an option to purchase property known as "Holt's Landing," located at South Division Street between Philadelphia Ave-

nue and the Sinepuxent Bay in downtown Ocean City, Maryland. South Division Street, a 75–foot wide dedicated street, extends from the boardwalk which abuts the Atlantic Ocean on the east to Sinepuxent Bay on the west; it intersects with Baltimore and Philadelphia Avenues. To the immediate north of Holt's Landing, fronting on the north side of South Division Street, is a Coast Guard Station owned by the United States.

Inlet planned to construct a hotel and marina complex on the Holt's Landing property. In furtherance of its plans, Inlet's managing partner, Leo D'Aleo, appeared before a public work session of the City Council of Ocean City on August 28, 1985. At that time, D'Aleo proposed alternate plans for the development of the property, one of which contemplated utilizing, as part of the hotel building site, 25 feet of the southerly side of South Division Street, the length of which extended some 275 feet from Philadelphia Avenue to the bay. By obtaining this additional land, Inlet would be able to construct a larger hotel complex than if it was required to build it entirely on the Holt's Landing property. In addition, Inlet's plan contemplated using the City's riparian rights in the western terminus of South Division Street to enable it to construct pavilion shops on a pier to be erected into the bay. Under this plan, and in exchange for these rights from the City, Inlet would provide a number of public amenities to enhance the revitalization of the project area, including a bay-front public boardwalk.

On September 2, 1985, at a regular session of the City Council, this plan was presented to the Council. After some discussion of the proposal, the Council scheduled a public hearing for October 21, 1985, to permit public expression on the proposed plan. As advertised, the public notice of the meeting stated that the Council would consider Inlet's request that the City

"abandon as a part of a public street and ... grant, convey and quitclaim unto Inlet Associates ... the southernmost twenty-five (25) foot strip of South Division

Street from Philadelphia Avenue to the Bay for the full width of twenty-five (25) feet, all riparian rights and all interest in and to South Division Street for the full seventy-five (75) foot width of South Division Street westward from the terminus of South Division Street and the Bay."

At the October 21 public meeting, the Council President asked D'Aleo to explain the purpose of Inlet's request. D'Aleo stated that Inlet was "attempting to swap" 25 feet of the City's public right-of-way on South Division Street in return for Inlet's bulkheading the end of the street, providing a public boardwalk in front of the waterfront marina, installing street lighting and benches, and maintaining the entire area. D'Aleo also referred to six retail stores to be located in the marina complex. At this point, the Council President made clear that Inlet's building project had been submitted to the Ocean City Planning and Zoning Commission for approval and that all the Council was then considering was whether to grant Inlet's request to abandon and close the southerly 25 feet of South Division Street. One councilman stated that the City would be "swapping what they regard as possibly unused street square footage for this privately constructed public walkway." The Council President noted that Inlet's project had been discussed at the August 28 public work session of the Council; he said that the Council believed that the amenities to be provided by Inlet in return for the 25–foot strip of South Division Street "were in the public interest" and that the purpose of the public hearing was to determine "if the public really did agree that it was worth trading 25 feet of the street for the amenities we were receiving." A motion was then made that the City approve "the trading" of the 25–foot strip in return for the public amenities to be provided by Inlet, with the proviso that the hotel be limited to five stories in height, that the retail activity be limited to six shops, and that if Inlet's project failed for any reason the 25–foot wide section of South Division Street would revert back to the City. Before the vote on the motion, the City Solicitor reminded

the Council that Inlet also wanted "the riparian rights of the western terminus of the entire [75–foot] street for the purposes of the pier." The Council then voted unanimously (7–0) to approve Inlet's request.

By letter dated December 19, 1985, the City Solicitor confirmed that the municipality "as a result of formal action taken [by the Council] after the public hearing ... held on October 21, 1985," had agreed, subject to the stated conditions, to "abandon and quitclaim" to Inlet the southerly 25 feet of South Division Street from Philadelphia Avenue west to the Bay"; and to "assign riparian rights adjacent to South Division Street from its western terminus to enable Inlet to construct a pier into the Bay." The letter further specified Inlet's agreement to limit retail activity on the pier to marina-related shops; to limit the height of its hotel to five stories; to construct a seawall and bulkhead at the southern boundary of its property; to construct a boardwalk at least 15 feet in width along the entire western edge of its property from South First Street to the northern side of South Division Street; to grant a public right-of-way over the boardwalk; and, if requested by the City, to construct a 10–foot boardwalk down the northern side of South Division Street from the bay to Philadelphia Avenue; and to maintain the improvements and install certain street lights in the area. The City Solicitor's letter stated that "formal documentation" would have to be prepared which would provide "for a reverter to the City in the event Inlet fails to comply with the terms and conditions [of the agreement]."

Following the favorable vote on the Council's resolution, Inlet exercised its option and purchased the Holt's Landing property. It expended substantial sums of money in preparing plans to develop the project, ranging between one and two million dollars. Inlet obtained site plan approval for the property, a permit to construct the marina, and a height variance to allow for a five-story hotel. Up to this time, there was no opposition to the Inlet plan.

The Corps of Engineers, in the summer of 1986, required Inlet to change the proposal for its contemplated pier into the waters of the bay at the end of South Division Street. As a consequence, Inlet returned to the City Council on September 15, 1986 and requested an amendment to the Council's resolution to permit it to construct a restaurant in place of the pavilion shops. Whether the restaurant would be built upon the pier, or would be located entirely landward of the bay across the full 75–foot width of South Division Street, is not clear from the record. In any event, on motion duly made the Council agreed to the amendment by a 3 to 2 vote, with the proviso that the restaurant not exceed one story. Because of some irregularity at this meeting, the Council reconsidered the proposal on October 6, 1986, again approving it, this time by a 4–2 vote. At the October 6 meeting, the question arose for the first time as to whether the disposition of the City's property interests required an ordinance rather than a resolution. The City Solicitor advised the Council that the City Charter permitted disposition of property by resolution after public notice and a public hearing.

In October 1986, the City Solicitor prepared an "Agreement and Declaration of Covenants, Conditions, and Restrictions" between Ocean City and Inlet; it was characterized as a "general plan of development." It recited Inlet's ownership of the Holt's Landing property; that South Division Street was a dedicated 75–foot public street; that the Planning Commission of Ocean City had approved Inlet's project to construct a hotel with marina facilities; that Ocean City wanted Inlet's property "developed as part of its comprehensive effort toward the redevelopment of 'downtown' Ocean City"; that as part of the redevelopment Ocean City wanted to obtain "public access and rights of way along the Sinepuxent Bay"; that Inlet was willing to grant to Ocean City, "for use and benefit of the public, a right of way along the bayside" of its property; and that Inlet wanted the use of the 25–foot southerly strip of South Division Street "and certain riparian rights of both South

Division Street and South First Street." The agreement then set forth its terms and conditions which were consistent with the City Solicitor's earlier letter of December 19, 1985. The agreement, which was promptly signed by Inlet, was accompanied by a quitclaim deed and assignment, respectively, of the City's interest in the southerly 25–feet of South Division Street and the subject riparian rights. The Mayor of Ocean City declined to sign any of the documents, stating the belief that the property transfers could only lawfully be accomplished by a duly enacted ordinance.

On November 19, 1986, a complaint was filed in the Circuit Court for Worcester County, naming Ocean City, its Mayor and City Council President as defendants. The plaintiffs were various individual taxpayers and property owners, most of whom resided near Holt's Landing, together with Harrison Inn Inlet, Inc. (Harrison) and Assateague House Condominium Association (the Association), the council of unit owners of Assateague House Condominium.[1] The plaintiffs sought to enjoin the signing of any contract or deed for the conveyance of the 25–foot right-of-way on South Division Street or the assignment of the riparian rights; they claimed, *inter alia,* that valuable public property was being given without adequate consideration to private persons. The plaintiffs sought a declaration that in approving the subject property transfer, Ocean City had acted ultra vires; that an ordinance, rather than a resolution, was required to make any such dispositions; that the City Charter, as a condition to disposing of municipal property, required a determination by the City Council that the property was not needed for any public use and that the Council made no such determination. The plaintiffs further alleged that the City Council's action was unlawful due to

---

1. The Assateague Condominium is located at Sinepuxent Bay and Worcester Street, two blocks north of Holt's Landing. Harrison owned the Oceanic Motel property on South First Street, which adjoined Holt's Landing to the south. At one time, Inlet and Harrison had reached some agreement to develop a marina as a joint project in front of both of their properties.

conflicts of interest among Council members voting on the resolution; that the resolution itself was vague and unenforceable as an agreement; that the public notice of the Council meeting of October 21, 1985 failed to fairly apprise the public of the subject matter involved and the terms of the proposed transfers; that the terms of the purported agreement were materially varied after the adoption of the original October 21, 1985 resolution without additional public notice, as required by the charter. The plaintiffs claimed that the suit was filed in the interest of the public to save substantial public funds in the form of property rights and that they should be awarded reasonable counsel fees and expenses.

Ocean City and the individual defendants sought dismissal of the suit. Among other averments contained in their answer to the complaint, they asserted that a majority of the Council believed that a 75–foot wide street was not needed; that all other streets in downtown Ocean City were 50 feet in width; that maintenance of the additional 25 feet was not justified; and that the exchange for the boardwalk right-of-way along the bay was more beneficial to the public.

Inlet intervened in the action as a party defendant. It set forth nine defenses to the plaintiffs' complaint, including lack of standing to sue; that the plaintiffs had unclean hands; that they were guilty of laches; that the plaintiffs' action was barred by estoppel and waiver; and that no ordinance was required by the City Council to effectuate the proposed property transfers.

Inlet also filed a cross-claim and counterclaim against Ocean City and the plaintiffs. It alleged that it had expended over one million dollars in reliance upon the Council's favorable resolution and that a contract was thereby created between the City and Inlet. Inlet averred that the southerly 25 feet of South Division Street was "surplus" municipal property; that it had been the long-standing practice of the City to sell surplus municipal property to developers by resolution, and not by ordinance; and that no

ordinance was required by the City Charter to close or abandon streets or to assign riparian rights. Inlet, therefore, sought a declaratory judgment that no ordinance was required and it also sought specific performance of its agreement with the City.

The circuit court (Edmondson, J.), after an evidentiary hearing, concluded that the plaintiffs had standing to bring the suit; that the Ocean City Charter required an ordinance, rather than a resolution, to transfer the property interests in question; that the Council resolutions approving such property dispositions were, therefore, ultra vires and void; and that the plaintiffs' suit was not barred by laches, estoppel or unclean hands. The court enjoined the defendants from executing and signing any contract, deed, or other document transferring or conveying the subject property interests. The court denied Inlet's claim for specific performance; it also denied plaintiffs' request for counsel fees and out-of-pocket expenses as against both Inlet and Ocean City.

Both Inlet and the plaintiffs appealed to the Court of Special Appeals. We granted certiorari prior to decision by the intermediate appellate court to consider the significant legal issues raised in the case.

## II

Inlet first contends that the trial judge erred in determining that the City must pass an ordinance to authorize the conveyance of the property interests in question. It postulates that the City Council's resolution authorized the conveyance of "essentially surplus property in return for the public amenities which would enhance the revitalization of the downtown area." According to Inlet, this procedure of conveying City property by resolution was consistent with the practice in Ocean City since 1918. Nothing in the City Charter, Inlet argues, mandates that the authorization to convey City property must be by ordinance; to so require, Inlet claims, would unnecessarily hamper the functioning of municipal government. Inlet suggests that at best the

Ocean City Charter provisions are ambiguous as to the need for an ordinance as a prerequisite to the conveyance of City property. It therefore relies on the principle that a long-standing interpretation of the Charter as not requiring an ordinance should be followed. Moreover, Inlet argues that because it relied to its detriment on the long-standing practice to convey by resolution, and expended large sums of money in reliance upon the practice, the City and its officers, who must execute the quitclaim deed and assignment, are equitably estopped from requiring an ordinance to accomplish the property transfers in this case.

(A)

The present Charter of Ocean City was adopted on August 17, 1965, pursuant to the provisions of the Municipal Home Rule Amendment, Article XI–E of the Constitution of Maryland, which was ratified by the people on November 2, 1954. The general purpose of the constitutional provision was to permit municipalities to govern themselves in local matters. *Birge v. Town of Easton,* 274 Md. 635, 337 A.2d 435 (1975). Maryland Code (1981 Repl.Vol.), Article 23A, § 1 empowers municipal corporations to "pass and adopt all ordinances, resolutions or bylaws necessary or proper to exercise the powers granted herein or elsewhere." Section 2 of Article 23A implements Article XI–E by an express grant of powers to municipalities. *Annapolis v. Annap. Waterfront Co.,* 284 Md. 383, 389, 396 A.2d 1080 (1979). This section enumerates a number of "express ordinance-making powers" ranging in subject matter from advertising through zoning; it authorizes the municipality "to pass such ordinances not contrary to the Constitution of Maryland, public general law, or public local law as they may deem necessary" for municipal purposes.

Among other express powers contained in § 2(b) is that granted by subparagraph (24) which authorizes a municipality "to sell at public or private sale after twenty days' public notice and to convey to the purchaser or purchasers thereof any real or leasehold property belonging to the

municipality when such legislative body determines that the same is no longer needed for any public use."

Prior to the enactment in 1965 of Ocean City's present Charter, the municipality's Charter provisions were contained in the Code of Public Local Laws of Worcester County, §§ 170–208 (Everstine, 1961). Section 184 of the former Charter vested power in the City Council to make ordinances for a broad range of municipal purposes, expressly including the closing or altering of streets, lanes, and alleys. It further provided that the Mayor and City Council of Ocean City was vested with "control and superintendence over the public property of the city, and the ... easements of the public streets, ... with power to grant the same whenever to them the interest of the public shall demand." Section 185 of the former Charter expressly empowered the City Council "to pass all such ordinances not contrary to the Constitution of this State as it may deem necessary ... (3) for the protection and preservation of the city's property, rights and privileges"; and (54) "to close streets or parts of streets, lanes or alleys."

Ocean City's present Charter is arranged in fifteen Titles, covering Sections C–102 through C–1511. Section C–406 requires the City Council to keep a journal of its proceedings, including final action taken "on any question, resolution or ordinance." Section C–409 deals with procedures for enacting ordinances; it specifies that no ordinance may be passed at the meeting at which it is introduced; that after its first reading the proposed ordinance shall be published in a newspaper of general circulation in the municipality; and that no ordinance will be effective until approved by the Mayor or passed over the Mayor's veto by the City Council. Section C–410 deals with vetoes of ordinances by the Mayor and contains provisions relating to an override of the Mayor's veto. Section C–411 entitled "Referendum" establishes the procedure for petitioning ordinances to referendum vote of the people of the municipality.

Section C–413A provides for the general powers and duties of the City Council. It authorizes the Council to

make all "policy decisions," subject to the provisions of the Charter. Section C–414 outlines the powers of the City Council "to pass all such ordinances not contrary to the Constitution and laws of the State of Maryland or this charter as it may deem necessary" for municipal purposes. Section 414(49) entitled "Property" authorizes the Council to "convey any real or leasehold property when no longer needed for the public use, after having given at least twenty (20) days' public notice of the proposed conveyance." Section C–414(53) entitled "Streets" permits the Council to regulate the use of streets and to "close streets, or parts of streets, lanes or alleys and to permit the construction of public structures at the point where said streets dead end at parks, at the beach or at natural bodies of water." Section C–415 provides that for the purpose of carrying out the granted powers in the Charter the Council "may pass all necessary ordinances"; it also provides that the powers of the City "shall be exercised and enforced in the manner prescribed by this charter; or, if the manner be not prescribed, then in such manner as may be prescribed by ordinance."

Section C–1103C empowers the City to "close up any existing town public way or part thereof." Section C–1301 authorizes the City to "sell ... or otherwise dispose of any property belonging to the town." [2]

### (B)

5 E. McQuillin, *Municipal Corporations*, § 15.02 (3d ed. 1981) explains the difference between a resolution and an ordinance. A resolution "ordinarily denotes something less solemn or formal than, or not rising to the dignity of, an ordinance." A resolution passed by a legislative body

---

**2.** Article 23B of the Maryland Code entitled "Municipal Corporation Charter" sets forth a model charter; its sole function is to serve as a guide for municipal corporations if and when they revise their municipal charters. *See Campbell v. City of Annapolis,* 289 Md. 300, 424 A.2d 738 (1981). Ocean City's Charter conforms generally with the model municipal charter.

"deals with matters of a special or temporary character . . . [and] generally speaking, is simply an expression of opinion or mind concerning some particular item of business coming within the legislative body's official cognizance, ordinarily ministerial in character and relating to the administrative business of the municipality." *Id.* *See also Shaw v. City of Wakeeney,* 187 Kan. 301, 356 P.2d 832 (1960); *Baker v. City of Milwaukie,* 17 Or.App. 89, 520 P.2d 479 (1974); *Evans v. City of Jackson,* 202 Miss. 9, 30 So.2d 315 (1947). 1 C. Antieau, *Municipal Corporation Law,* § 414 (1988) declares that all administrative or ministerial powers possessed by the governing body of a municipality may be exercised by resolution. *See State ex rel. Morrison v. City of Seattle,* 6 Wash.App. 181, 492 P.2d 1078 (1971); *Kalamazoo Mun. Util. Assn. v. City of Kalamazoo,* 345 Mich. 318, 76 N.W.2d 1 (1956).

■ An ordinance is distinctly a legislative act; it prescribes "some permanent rule of conduct or government, to continue in force until the ordinance is repealed." McQuillin, *supra,* § 15.02. Municipal charters generally "contemplate that all legislation creating liability or affecting in any important or material manner the people of the municipality should be enacted by ordinances." *Id.* Of course, a common distinction between a resolution and an ordinance is that only the latter need be signed by the Mayor or passed over his veto. *Id.* That municipal enactments must be in the form of ordinances when so required either by charter or statute is clear. *See* Antieau, *supra,* § 415 and cases there cited. Otherwise stated, whenever the controlling law directs the legislative body to do a particular thing in a certain manner the thing must be done in that manner. We recognized these principles in *Hagerstown v. Long Meadow Shopping Center,* 264 Md. 481, 287 A.2d 242 (1972). Citing McQuillin, *supra,* § 15.02, we there concluded that, absent an ordinance, a long-standing policy of a municipality not to require a building permit in certain circumstances was without legal effect. *See also Havre de Grace v. State Board,* 234 Md. 222, 198 A.2d 732 (1964). Indeed, our cases

recognize that if a municipal action is one of general appli-cation prescribing a new plan or policy, it is considered legislative and therefore must be accomplished by ordi-nance. *See, e.g., City of Bowie v. County Comm'rs,* 258 Md. 454, 463–64, 267 A.2d 172 (1970); *Scull v. Montgomery Citizens League,* 249 Md. 271, 282, 239 A.2d 92 (1968). *See also* McQuillin, *supra,* § 10.06.

### (C)

█ As already observed, § 2 of Article 23A, in enumer-ating the powers granted to the legislative body of a municipality, refers to them collectively as "express ordi-nance-making powers." The provisions of this statute "es-tablish minimum requirements with respect to the affairs of municipalities [but] . . . municipalities are not prohibited by the [Municipal Home Rule] Amendment or the statute from providing such additional standards and safeguards as to them seem appropriate." *Reed v. Pres. of North East,* 226 Md. 229, 249, 172 A.2d 536 (1961). Consistent with § 2 of Article 23A, §§ C–414 and C–415 of the Ocean City Charter refer collectively to the exercise of the powers granted to the City Council in terms of enacting ordinances. Of the fifty-eight express powers enumerated in C–414, four con-tain a provision for their exercise "by ordinance" or "by appropriate ordinance." [3] As all the powers granted to the legislative body by Article 23A, § 2 are characterized as ordinance-making powers, we reject Inlet's suggestion that the passage of an ordinance is required under the Ocean City Charter *only* in connection with those four subsections of § C–414, and, conversely, when special mention of an ordinance is omitted, as in most other sections of the charter, including §§ C–414(49), C–1301, and C–1103, an

---

**3.** Ordinances are specifically referred to in the following provisions: § C–414(7) ("to regulate *by ordinance*" municipal bands); § C–414(42) (to abate nuisances *"by appropriate ordinance"*); § C–414(45) (to install parking meters "in such places as they shall *by ordinance* determine, and *by ordinance* to prescribe rates"); and in § C–414(51) ("[t]o adopt *by ordinance*" health and safety regulations).

ordinance is not necessary. To so conclude would, of course, permit the City Council to exercise most of its governing powers without ever enacting an ordinance which was subject to the executive's veto or the people's right to referendum. Manifestly, this runs counter to the provisions of Article 23A, § 2, which in their entirety demonstrate an intention that the city council act upon municipal affairs through ordinances when performing its legislative function. On the other hand, since Article 23A, § 2 and § C–406 of the Ocean City Charter also authorize the City Council to act by resolution in the exercise of its granted powers, the enactment of ordinances in every instance was not contemplated; otherwise, the City Council could never act by resolution. Consequently, we think it plain that the express mention of "ordinance" in the four subsections of § C–414 is, at most, a drafting redundancy.[4] Implicit in the statutory and charter provisions is the recognition that the city council may act only by ordinance when enacting municipal legislation. Thus, where the charter requires that the municipal action be done by ordinance, as with legislative acts, a resolution will not suffice. McQuillin, *supra*, § 15.06. In considering the legality of the action taken by the City Council in this case, therefore, and in particular whether in the circumstances the conveyances could properly be authorized by resolution, we look to the substance of what the City Council undertook to achieve by its action.

We first note that streets are held and controlled by the municipality "as avenues of communication for the whole public, and not to be hired or rented to private persons for revenue. ... [T]he general public [is] entitled to the use of the street from end to end and from side to side." *Huebschmann v. Grand Co.*, 166 Md. 615, 628, 172 A. 227 (1934), quoted with approval in *Perellis v. M. & C.C.*

---

4. The model municipal charter contained in Article 23B, which Ocean City closely tracked when adopting its own charter, contains the same redundancy. Of course, Article 23B is a guide only, *see* n. 3, *supra*. It is not itself law and to the extent that its provisions conflict with Article 23A, the latter is controlling.

*of Balto.*, 190 Md. 86, 93, 57 A.2d 341 (1948). In other words, the streets of a municipality are held in trust for the benefit, use, and convenience of the general public. *Sinclair v. Weber*, 204 Md. 324, 104 A.2d 561 (1954); *Townsend, Grace & Co. v. Epstein*, 93 Md. 537, 49 A. 629 (1901). Thus, the closing of a street, and the conveyance of the City's interest in the street solely for the private benefit of another, is not within the legislative body's power; whether to close a dedicated street necessarily turns "upon considerations of public benefit, and not by barter and sale to private interests, otherwise the location of the highways would be in the hands of the highest bidders." *Perellis, supra*, 190 Md. at 94–95, 57 A.2d 341. *See also Van Witsen v. Gutman*, 79 Md. 405, 29 A. 608 (1894) and *Rescue Fire Co. v. County Commissioners*, 188 Md. 354, 52 A.2d 733 (1947). These same principles, we think, apply to the assignment of the City's riparian rights, if any, at the western terminus of South Division Street and South First Street.

Article 23A, § 2(b)(24), which authorizes a municipality to sell and convey municipal property, requires that the "legislative body determine[ ] that the same is no longer needed for any public use." Section C–414(49) of the Ocean City Charter, dealing with the conveyance of City-owned property, authorizes the City Council to convey such property "when no longer needed for the public use." The requirement that the legislative body affirmatively make such a determination is implicit in Ocean City's Charter; indeed, it is mandated by the controlling provisions of Article 23A, § 2(b)(24). While §§ C–414(53), C–1103C, and C–1301 of the City Charter separately authorize the City Council to close or abandon a dedicated street, a determination that there is no longer any public need for the street is requisite to the validity of the Council's action.

### (D)

The purported agreement between Inlet and Ocean City encompassed more than merely a street closing and assign-

ment of municipal riparian rights. These proposed convey-
ances were inextricably tied to, and provided the quid pro
quo for, Inlet's willingness to provide and maintain the
heretofore described public amenities by which, along with
its own construction projects, it proposed to revitalize the
bay side of downtown Ocean City. Inlet's proposal was
properly characterized as a general plan of development, a
comprehensive effort toward the redevelopment of down-
town Ocean City. If implemented, therefore, the project
would make very substantial changes in the face of down-
town Ocean City. Plainly, it involved more on the part of
the Council than the mere ministerial or administrative
execution of an existing law. Legislative action by the
Council was required consistent with the requirements of
Article 23A, § 2(b)(24) and § C–414(49) of the City Charter
to sanction the "swap" of City property for the public
amenities to be provided and maintained by Inlet. The City
and Inlet were trading benefits as a means of triggering a
new plan of development which was of great importance to
the people and future of Ocean City—a plan in which the
City's dedicated street and riparian rights were key instru-
ments, and without which the planned project might not
proceed.

We recognize that the City Council, in adopting a
resolution rather than an ordinance, acted on the advice of
its City Solicitor. The record discloses that, since 1918, the
City had authorized approximately 125 street and alley
closings by resolution (a few others, however, were done by
ordinance). Such a long-standing construction of Ocean
City's Charter powers (at least since the adoption of its
present Charter in 1965) by the officials charged with its
administration is due considerable deference by the courts
when an ambiguity exists as to the proper interpretation of
the Charter provisions. *See, e.g., Balto. Gas & Elec. v.
Pub. Serv. Comm'n,* 305 Md. 145, 161, 501 A.2d 1307 (1986);
*National Asphalt v. Prince Geo's Co.,* 292 Md. 75, 80, 437
A.2d 651 (1981). But no custom, however venerable, can
nullify the plain requirements of a statute or charter provi-

sion or otherwise confer power on a legislative body. *See Rogan v. B. & O.R.R. Co.*, 188 Md. 44, 58, 52 A.2d 261 (1947); *Hanna v. Bd. of Ed. of Wicomico Co.*, 200 Md. 49, 87 A.2d 846 (1952), *supra;* and McQuillin, *supra,* § 10.17. In other words, the unvarying construction of a charter provision by those charged with its enforcement over a long period of time cannot override the plain meaning of an unambiguous provision or extend it beyond its clear import. *See Macke Co. v. Comptroller*, 302 Md. 18, 485 A.2d 254 (1984); *Comptroller v. A. Cyanamid Co.*, 240 Md. 491, 214 A.2d 596 (1965). While the City Solicitor's interpretation of the Charter provision is entitled to some weight, he, of course, has no greater power to bind the municipality than a private attorney has to bind a client. *See City of Baltimore v. Crane*, 277 Md. 198, 352 A.2d 786 (1976).

■ To require an ordinance in this case, Inlet suggests, is to jeopardize the legality of numerous previous street and alley closings in Ocean City, which were authorized by resolution. None of these prior deeds appear to involve conveyances of municipal property interests under circumstances even remotely approaching those now before us. Indeed, a review of these deeds indicates that they did not involve, as here, a general development plan but rather were routine partial street or alley closings or abandonments.[5] In any event, we do not consider the legality of those prior conveyances.[6] Considering the central involvement of South Division Street and the waters of the bay in Inlet's proposal, and the magnitude of the property inter-

---

**5.** The plaintiffs suggest that the deeds do not reveal whether the streets or alleys were in existence or had been dedicated, accepted or previously abandoned. They also point to evidence in the record that a former Mayor of Ocean City, who also served as a City Councilman (a total of 22 years), said that the City never closed 50 or 75 foot streets but only 10 to 12 foot alleys, when they were no longer needed.

**6.** It is, of course, a common legislative practice to validate prior acts taken by a legislative body in attempted, but allegedly defective, pursuance of its lawful authority. *See, e.g.,* § 174 of the Code of Public Local Laws of Worcester County (Everstine, 1961).

ests involved (City property of estimated value approximating one million dollars), a simple resolution, neither reduced to writing nor journalized as required by the City Charter, cannot suffice to validate the City's actions. An ordinance was thus fundamental to the legality of the conveyances here in question; without it, the City Council's action was without legal effect.

(E)

In maintaining that the doctrine of equitable estoppel should be applied against the City, Inlet says that the act giving rise to the estoppel is the Mayor's refusal to sign the deeds conveying the property. Inlet emphasizes the long-standing and consistent interpretation of the City Charter as not requiring an ordinance to authorize the conveyance of municipal property. It contends that this was a reasonable interpretation of the relevant Charter provisions but that, in any event, there was an ambiguity in the Charter as to whether a resolution or an ordinance would suffice to convey property; that the City and its officials, including the Mayor, led Inlet into attempting to accomplish the conveyance by resolution; that Inlet expended large sums of money in reliance upon the interpretation of the City officials; and that Inlet had no notice that the City Council was acting in excess of its power, if in fact it was, in passing a resolution rather than an ordinance. According to Inlet, the law of Maryland sanctions the application of equitable estoppel principles against a municipal corporation in appropriate circumstances. It therefore maintains that the trial judge erred in holding that estoppel could not be applied in this case because passage of a resolution, rather than an ordinance, was an ultra vires act.

There is no settled rule in this country as to when, and under what circumstances, equitable estoppel is available against a municipal corporation. *Permanent Fin. Corp. v. Montgomery Cty.*, 308 Md. 239, 518 A.2d 123 (1986). Our cases have continually applied the definition of equitable

estoppel set forth in 3 J. Pomeroy, *Equity Jurisprudence* § 804 (5th ed. 1941) as follows:

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed, either of property, or contract or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

9A McQuillin, *supra*, § 27.56 points out that a number of jurisdictions have held that equitable estoppel may be applied against a municipality "when appropriate circumstances, justice and right so require" as when there has been "some positive acts by [municipal] officers that have induced the action of the adverse party." Moreover, as McQuillin notes, it must appear that "the party asserting the doctrine incurred a substantial change of position or made extensive expenditures in reliance on the act." *Id.*

In *Permanent Fin.*, we reviewed our cases involving equitable estoppel as against a government entity. We noted, 308 Md. at 249, 518 A.2d 123, that while municipal corporations are not exempt from application of equitable estoppel principles, "in practice we have applied the doctrine more narrowly." In so holding, we cited a number of our prior decisions, including *Berwyn Heights v. Rogers,* 228 Md. 271, 279–80, 179 A.2d 712 (1962) where we said that equitable estoppel may apply against a municipality "at least where the acts of its officers are within the scope of their authority and justice and right require that the public be estopped." We further noted in *Berwyn Heights* that, generally, a municipality is not estopped to assert the illegality of a permit because the issuance of such a permit creates no vested right in the permittee. In *Lipsitz v. Parr,* 164 Md. 222, 227, 164 A. 743 (1933), we reiterated that a municipality "may be estopped by the act of its officers if done within the scope and in the course of their authority or

employment, but estoppel does not arise should the act be in violation of law." 164 Md. at 227, 164 A. 743. In *City of Hagerstown v. Long Meadow*, 264 Md. 481, 287 A.2d 242 (1972), we considered applying the doctrine of equitable estoppel against the city when an administrative official, in good faith and within the ambit of his duty, made an erroneous interpretation of an ordinance upon which a property owner relied to its detriment. In declining to apply the doctrine, even where the city officials appeared to follow a long-standing municipal policy, we said that equitable estoppel is "bottomed on the need for the interpretation or clarification of an ambiguous statute or ordinance, and that element had not been established." 264 Md. at 493, 287 A.2d 242.

The facts in *Permanent Fin.* indicated that a developer who had undertaken construction of a building sought relief from the county's suspension of its building permit and the imposition of a stop work order. The dispute involved whether a height restriction contained in the county code, which allowed additional height for "nonhabitable structures" permitted the top floor of the building to be used for offices. The code provision was subject to at least two reasonable interpretations. The county had shared the builder's interpretation at the time it issued the building permit and consistently applied that interpretation for a significant period of time. We held that since the builder had expended substantial funds in reliance upon the county's long-standing interpretation of the code provision, which was a reasonable and debatable interpretation, it would be inequitable to permit the county to then apply a different rule in that case.

Unlike *Permanent Fin.*, the present case does not turn on the ambiguity vel non of a county ordinance which was subject to two reasonable interpretations. Rather, we are now considering whether a municipality may be estopped when its city council, in clear violation of a fundamental charter requirement that it act by ordinance, with all the deliberate safeguards attendant upon the legislative

process, purports to bind the municipality through passage of a simple resolution which is neither subject to executive approval nor veto nor the public right of referendum. Of course, no principle is better settled than that persons dealing with a municipality are bound to take notice of limitations upon its charter powers. *See City of Hagerstown, supra,* 264 Md. at 493, 287 A.2d 242; *Hanna v. Bd. of Ed. of Wicomico Co.,* 200 Md. 49, 57, 87 A.2d 846 (1952); *Gontrum v. City of Baltimore,* 182 Md. 370, 375, 35 A.2d 128 (1944). Consequently, "[e]veryone dealing with officers and agents of a municipality is charged with knowledge of the nature of their duties and the extent of their powers, and therefore such a person cannot be considered to have been deceived or misled by their acts when done without legal authority." *Lipsitz v. Parr, supra,* 164 Md. at 228, 164 A. 743. *See also Berwyn Heights, supra,* 228 Md. at 279, 179 A.2d 712. Therefore, the doctrine of equitable estoppel "cannot be ... invoked to defeat the municipality in the enforcement of its ordinances, because of an error or mistake committed by one of its officers or agents which has been relied on by the third party to his detriment." *Lipsitz,* 164 Md. at 228, 164 A. 743. In the same vein, McQuillin, *supra,* § 29–104c states that estoppel cannot make lawful a municipal action which is beyond the scope of its power to act or is not executed in compliance with mandatory conditions prescribed in the charter. In other words, the doctrine of equitable estoppel cannot be invoked to defeat a municipality's required adherence to the provisions of its charter simply because of reliance upon erroneous advice given by an official in excess of his authority. *See City of Baltimore v. Crane, supra,* 277 Md. at 206, 352 A.2d 786. When, as here, it is a patent violation of one of the most fundamental provisions of a municipal charter—that its legislative body, when required to act in a legislative capacity, do so only by ordinance—it cannot matter that a party relies upon erroneous official advice to its detriment.

None of this is to say that a municipality cannot be estopped where in the course of executing its granted powers it merely does so irregularly or defectively. Nor is it essential to the application of equitable estoppel principles that there be wrongful or unconscionable conduct on the part of the municipality, although that is generally an element of estoppel. *Knill v. Knill,* 306 Md. 527, 534, 510 A.2d 546 (1986). On the contrary, "an estoppel may arise even where there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other." *Id.* Also recognized is that a municipality may make an offer by ordinance which, if accepted and acted upon by another in compliance with its terms, may give rise to a contract, the obligation of which is constitutionally protected against impairment. *City of Baltimore v. Crane, supra,* 277 Md. at 207, 352 A.2d 786. The same principle would, we think, apply to a resolution duly passed by a city council in the exercise of its granted power. But in the circumstances of this case, right and justice, considered both from the public perspective as well as from that of the injured party, does not permit a holding that the municipality is equitably estopped by its actions, even though in violation of law, to refuse to convey the property interests in question to Inlet. In so concluding, we have considered other cases relied upon by Inlet but find them inapposite on their facts.[7]

Closely allied to the doctrine of equitable estoppel is that of laches which Inlet claims bars the plaintiffs' action in this case. We find no merit in the contention.

The doctrine of laches was before the Court most recently in *Permanent Fin., supra.* We there pointed out that laches was an equitable defense—an inexcusable delay, without necessary reference to duration, in the assertion of

---

7. *See City of Baltimore v. Crane, supra; Baltimore County v. Letke,* 268 Md. 110, 299 A.2d 781 (1973); *Leaf Co. v. Montgomery County,* 70 Md.App. 170, 520 A.2d 732 (1987); *Prince George's County v. Silverman,* 58 Md.App. 41, 472 A.2d 104 (1984).

a right. 308 Md. at 256, 518 A.2d 123. Our cases hold that unless barred by the statute of limitations, mere delay in bringing an action is not sufficient to constitute laches if the delay has not worked a disadvantage to others. *See Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 300 A.2d 367 (1973); *Howell v. Brummell,* 293 Md. 646, 446 A.2d 1149 (1982); *Bowie v. Ford,* 269 Md. 111, 304 A.2d 803 (1973); *Lipsitz v. Parr,* 164 Md. 222, 164 A. 743 (1933). In *Gloyd v. Talbott,* 221 Md. 179, 186, 156 A.2d 665 (1959), we said that "laches should not be applied against a public body, or in a derivative suit with the same rigor as against an individual"; and that laches "is a special application of the doctrine of estoppel, which does not generally apply against a public body."

The trial judge noted that the City Council did not place its final imprimatur on the Inlet proposal, which as amended included the restaurant in place of the shops on the pier, until October 6, 1986; and that the present case was filed approximately one month later. One reason for the opposition of the unit owners in Assateague House was the late inclusion of the restaurant and its location in the Inlet proposal. In any event, we think it clear from our discussion of equitable estoppel that the doctrine of laches, even if otherwise applicable, does not legalize this patent violation of the Ocean City Charter. We note parenthetically, however, that until the summer of 1986, Inlet had not received the necessary permits and authorizations to permit it to proceed to implement its proposed plan. Plaintiffs' suit in November of 1986 was hardly a delay befitting a serious claim of laches.

Inlet further suggests that a proper application of the "clean hands" doctrine barred the plaintiff's action. Specifically, it says that all plaintiffs, except one, benefited from the identical procedure now being challenged by them. Specifically, it argues that the properties on which Assateague House and Harrison's Oceanic Motel are situated were assembled in part from land deeded by the City without an ordinance having been enacted. Thus, they say

that it is inequitable to permit the plaintiffs to now assert the invalidity of the procedure, the results of which have served to increase the value and utility of their own properties.

While the trial judge did not expressly address this issue, it appears uncontradicted upon the record that none of the Assateague House unit owners, or Harrison, received deeds from the City conveying municipal property to them in the challenged manner. All things considered, the "clean hands" doctrine is not applicable in the circumstances of this case.

### III

Inlet claims that the plaintiffs lacked standing to maintain this action because they did not establish, as required by Maryland law, that the proposed conveyances of municipal property caused them any special damage distinct in character from any injury sustained by members of the general public. In particular, Inlet says that the plaintiffs did not show that the challenged action would increase their taxes or otherwise cause them any pecuniary loss.

In finding that the plaintiffs had standing to bring the action, the trial judge found that they were taxpayers and property owners in Ocean City, all but one of whom lived in close proximity to the project proposed by Inlet. After reviewing the allegations in the complaint and the evidence adduced at trial, the trial judge concluded that the plaintiffs had established a special pecuniary injury to themselves which flowed from the ultra vires action of the municipality, *i.e.*, that the value of their properties may be adversely impacted by the Inlet proposal and that they had also suffered damage, having shown that their taxes might be increased as a result of the project.

The law of Maryland on standing to sue is well articulated in *Citizens Planning & Housing Ass'n v. Co. Executive of Baltimore Co.*, 273 Md. 333, 329 A.2d 681 (1974); we said that a taxpayer may invoke the aid of a

court of equity to restrain the action of a public official, which is illegal or ultra vires and may injuriously affect the taxpayer's rights and property. 273 Md. at 339, 329 A.2d 681. The taxpayer will be allowed such relief, however, only when some special damage is alleged and proved, or a special interest is shown distinct from that of the general public. This, we said, requires "a showing that the action being challenged results in a pecuniary loss or an increase in taxes." *Id.* We recognized, however, that the extent to which a taxpayer is capable of detailing the damage anticipated from an illegal and ultra vires act may be rather limited at the time the suit is initially filed. *Id.* at 344, 329 A.2d 681. Thus, we held that the taxpayer plaintiff is not required to allege facts which *necessarily* lead to the conclusion that taxes will be increased; rather, the test is whether the taxpayer "reasonably *may* sustain a pecuniary loss or a tax increase"—"whether there has been a showing of *potential* pecuniary damage." *Id.* (emphasis in original). These principles are in accord with our statement in *Thomas v. Howard County*, 261 Md. 422, 432, 276 A.2d 49 (1971) that Maryland has "gone rather far in sustaining the standing of taxpayers to challenge ... alleged illegal and ultra vires actions of public officials." An extensive review of relevant cases is set forth in *Citizens Planning, supra,* 273 Md. at 338–43, 329 A.2d 681. *See also James v. Anderson,* 281 Md. 137, 377 A.2d 865 (1977); *Green v. Garrett,* 192 Md. 52, 63 A.2d 326 (1949); *Hanlon v. Levin,* 168 Md. 674, 179 A. 286 (1935); *Konig v. M. & C.C. of Balt.,* 128 Md. 465, 97 A. 837 (1916).

 We agree with the trial judge that the plaintiffs had standing in this case. It was alleged and sufficient proof adduced that the Assateague House unit owners looked directly upon Inlet's proposed project, including the restaurant. There was some evidence that the municipality's property interests were valued in excess of one million dollars and if it received fair value for it the City might reduce taxes or forego a tax increase in the future; and that there would be a loss of substantial revenue from the

metered parking spaces on that part of South Division Street which was to be closed and that this would have an adverse impact on plaintiffs' taxes. There was also evidence that guests and invitees of the property owners now use that part of South Division Street to be conveyed to Inlet for parking and that this usage enhances the value of their respective properties. It was also alleged and shown that as a 75–foot wide street, South Division Street was of extreme value in itself; that, in particular, it provided public access to the bay, the loss of which would adversely affect the value and use of the plaintiffs' properties; that the restaurant in particular would obstruct the view of the bay and lessen the value of the plaintiffs' properties. In these ways, the plaintiffs claimed that they would be specially harmed in a manner distinct from the general public in that their properties would be decreased in value, as found by the trial judge. And, finally, the plaintiffs alleged that as taxpayers they would sustain a loss from the expenditure of City funds which would be necessary for the City to defend the legality of the proposed conveyances.

Inlet suggests that the plaintiffs' taxes would likely be diminished rather than increased if its project is permitted to proceed. Moreover, it suggests that the plaintiffs would realize a pecuniary gain from the construction of the project, as it would increase the overall value of their properties. Therefore, according to Inlet, the plaintiffs' would realize a pecuniary gain from the construction of the project, as it would increase the overall value of their properties. Therefore, according to Inlet, the plaintiffs' properties would not be injuriously affected; they will suffer no pecuniary loss, or an increase in taxes. A similar argument advanced in *Citizens Planning* was found wanting; there we indicated that in determining a taxpayer's pecuniary injury resulting from a claimed unlawful governmental act, the court will not weigh potential gains against potential losses and speculate on a net result. 273 Md. at 343–44, 329 A.2d 681. As we said in that case, the taxpayer need not demonstrate that, *necessarily*, there will be pecu-

niary loss or increased taxes, but only the reasonable existence of that potential. Accordingly, we cannot say on the record before us that the trial judge erred in finding the requisite standing to sue in this case.

## IV

In their cross-appeal, the plaintiff taxpayers seek an award of counsel fees and reasonable expenses and costs against Ocean City, at least until the time of Inlet's appeal. They contend their suit was filed to enjoin the municipality from illegally conveying valuable City property to a private developer, thereby performing a great service in the public interest. The plaintiffs rely on *Konig v. M. & C.C. of Balt.*, 128 Md. 465, 97 A. 837 (1916) and a number of cases from other jurisdictions where attorney fee awards were made by courts acting under their equitable powers in instances involving the preservation of municipal funds and property through taxpayer actions.

The plaintiffs also seek an award of counsel fees and expenses against Inlet, both at the trial level and for the appeal in this case. As to the latter, the plaintiffs claim that Inlet's appeal was frivolous, taken in bad faith and without substantial justification in violation of Maryland Rule 1–341.[8] In furtherance of this contention, the plaintiffs say that when Inlet filed its appeal, it was in the process of preparing and obtaining approval for a new plan to build a new project entirely on its own property, thereby abandoning the proposal which is the subject of this appeal. Moreover, the plaintiffs say that because Inlet refused to dismiss its appeal, they were put to great expense and effort in briefing and arguing the appeal.

---

**8.** Rule 1–341 authorizes the court to require that a party which maintains a suit in bad faith and without substantial justification pay to the adverse party the costs of the proceeding and reasonable expenses, including reasonable attorney fees, incurred by the adverse party opposing the suit.

While acknowledging that it is presently proceeding with an alternate plan of construction, Inlet suggests that it is doing so only in an effort to ·"cut its losses" should its appeal fail; that it has not abandoned its intention to proceed with its original proposal if permitted to do so; and that the municipality, which has already accepted Inlet's plan, will be required to proceed with its contract if Inlet's appeal is successful.

There being no statutory authority for an award of attorney fees in taxpayer actions, and the suit in this case not having resulted in the creation of a fund for payment of such fees or costs, Ocean City maintains that the requested award is wholly within the discretion of the court acting by way of its equitable powers. It points out that no fund was created in this case and that, furthermore, the plaintiffs at no time during trial introduced any evidence to establish their right to attorney fees and costs. It argues that we should affirm the trial court's denial of the plaintiffs' request for reasonable attorney fees and costs.

The record in this case, while voluminous is unenlightening in a number of important details. For our purposes, it is enough to note that, like the trial judge, we glean from the record that the plaintiffs were not primarily motivated by a desire to safeguard and preserve municipal property in the public interest but rather were principally proceeding in furtherance of their individual interests. Of course, we have no way of knowing whether, as Inlet suggests, the plaintiffs were motivated purely by spite, although it is clear that some of them originally supported Inlet's project and spoke in favor of it. The reasons for the change in · allegiance are not clear to us, but against this background we see no reason to do anything other than to confirm the trial judge's decision not to award attorney fees and costs to the plaintiffs at the trial level. Nor do we think that Inlet, by appealing, violated Rule 1–341; indeed, as Inlet points out, the case was deemed of sufficient public importance as to trigger our grant of certiorari.

JUDGMENT ON THE APPEAL OF INLET ASSOCI-
ATES AFFIRMED; JUDGMENT ON THE CROSS–AP-
PEAL OF ASSATEAGUE HOUSE CONDOMINIUM ASSO-
CIATION, et al. AFFIRMED. COSTS TO BE PAID,
THREE–FOURTHS BY INLET ASSOCIATES AND ONE–
FOURTH BY ASSATEAGUE HOUSE CONDOMINIUM
ASSOCIATION, et al.